## CAF INVESTMENT COMPANY v SAGINAW TOWNSHIP

Docket Nos. 60744, 60745. Argued January 11, 1979 (Calendar No. 3).
—Decided February 24, 1981. Rehearing denied 411 Mich 1119.

C.A.F. Investment Company challenged the 1971 property tax
assessment by Saginaw Township of real property which the
plaintiff leases to S.S. Kresge Company on a long term for a K-
Mart store. For the years now in dispute, 1971 through 1975,
the actual rental income to the plaintiff under the terms of the
lease was relatively low, but expert witnesses for both parties
have conceded that the lease fairly reflects economic conditions
for 1963, the year the lease was made. The valuation of the
property by the township in 1971, $1,442,364, was computed
from a capitalization of "economic rental value" derived from
an analysis of the operations of similar K-Mart stores. The
plaintiff argued that the true cash value should be determined
by capitalizing the actual rental income under the terms of the
lease, and that the valuation should have been $787,500 for
1971. The State Tax Commission essentially sustained the

REFERENCES FOR POINTS IN HEADNOTES
[1, 22] 5 Am Jur 2d, Appeal and Error § 820 et seq.
[2, 22] 5 Am Jur 2d, Appeal and Error § 744 et seq.
    46 Am Jur 2d, Judgments §§ 400, 416.
[3, 4, 12, 15, 17, 18, 21, 23, 25, 26] 33 Am Jur 2d, Federal Taxation
    ¶ 1052.
    72 Am Jur 2d, State and Local Taxation § 761.
[5-9, 11-20, 23-26, 28-31] 34 Am Jur 2d, Federal Taxation ¶ 8960 et seq.
    72 Am Jur 2d, State and Local Taxation §§ 761, 763.
[6, 8, 25] 72 Am Jur 2d, State and Local Taxation § 759.
[7] 72 Am Jur 2d, State and Local Taxation §§ 759, 770 et seq.
[9-12, 16] 72 Am Jur 2d, State and Local Taxation § 768.
[10] 34 Am Jur 2d, Federal Taxation ¶ 1861.
[13] 72 Am Jur 2d, State and Local Taxation §§ 759, 765, 766.
[19] 72 Am Jur 2d, State and Local Taxation § 763.
[20] 72 Am Jur 2d, State and Local Taxation §§ 759, 761.
[22] 72 Am Jur 2d, State and Local Taxation § 787.
[24] 72 Am Jur 2d, State and Local Taxation § 754.
[27, 28] 71 Am Jur 2d, State and Local Taxation §§ 125, 127.
[30] 72 Am Jur 2d, State and Local Taxation § 770 et seq.
[31] 73 Am Jur 2d, Statutes § 271.

township's assessment; the Supreme Court reversed the decision of the commission, and remanded to the newly formed Tax Tribunal for a hearing *de novo* to determine the true cash value of the property based upon the actual income from it. 392 Mich 442. Upon remand the Tax Tribunal predicated valuation on the amount of income the plaintiff's property was "capable of producing" for the years 1971 through 1975, which were by then included in the dispute. The Court of Appeals, D. F. Walsh, P.J., and Quinn and Stair, JJ., reversed and remanded to the Tax Tribunal for a redetermination in accordance with the opinion of the Supreme Court (Docket Nos. 28515, 28516). Defendant appeals, arguing that the decision did not require the valuation of the plaintiff's property to be based solely upon the actual rent. In an opinion by Justice Ryan, joined by Chief Justice Coleman and Justices Kavanagh and Levin, the Supreme Court *held:*

1. It was presumptuous for the Tax Tribunal to embark upon a legal analysis of a question that was clearly presented to and decided by the Supreme Court on the prior appeal. The doctrine of the law of the case is that if an appellate court has decided a legal question and remanded the case for further proceedings, the legal questions thus decided will not be differently decided on a subsequent appeal in the same case where the facts remain materially the same. The controlling facts in this dispute remain virtually identical with those which obtained when the dispute was first decided by the Supreme Court, other than the extension of the valuations through 1975. The appraisals submitted by the parties to the Tax Tribunal, in essence, used the same methods of valuation and arrived at virtually the same values as had been presented before. The Tax Tribunal relied on an appraisal which substituted the economic rental, or hypothetical income, for the actual rent of the plaintiff's property under the lease, despite the Court's prior rejection of that criterion as a proper basis of valuation. The error in basing valuation upon the rental value of comparable property was clearly stated in the prior decision of the Court. In its decision upon remand the Tax Tribunal has attempted to justify essentially the same method of evaluation that was held to be erroneous; in fact, it used the same "economic rental" figure of $2 per square foot which the State Tax Commission had used in its calculations. The conclusions by the Tax Tribunal that the prior decision required only that actual income be "considered", in determining true cash value, and that actual income could then be ignored because it did not accurately reflect current rates of return on comparable prop-

erty on the market, underestimates the significance the Court attached to actual income. All the appraisers testified that the capitalization of income method was the best indication of value. Commercial investors rely heavily upon cash flow represented by the capitalization of actual income to judge the fair market value of property. Once that method of valuation had been chosen, consideration of "economic income" as provided by statute was imperative. The prior decision left no doubt that "economic income" meant nothing other than actual income under the circumstances of this case.

2. A calculation under the capitalization-of-income method yields a projected income figure. Often that figure alone will reflect the fair market value of the property. The defendant argues that any projected income figure calculated on the basis of actual income evaluates only the lessor's interest in the property, and that the lessee has a measurable interest in the land due to the economic advantage it enjoys by renting property for an amount that is less than the prevailing rate in the current market. Whatever merit that proposition might have in the science of real estate appraisal, consideration of a so-called lessee's interest by the means employed by the Tax Tribunal is foreclosed by the Court's prior decision. The testimony of the tax commission experts was that in order to evaluate the entire property, consisting of both the lessor's and lessee's interest, anytime actual income fell below the market rent or hypothetical income of comparable property actual income would be ignored, and it was ignored in this case for that very reason.

3. True cash value must equal the fair market value of the property to the owner. All experts conceded that economic income most accurately reflected that value. In this case, economic income is nothing other than actual income, since for the years in question the lease rental reflected current economic circumstances and bore a demonstrable relation to true cash value. To equate economic income with hypothetical income in every situation where actual rent under a long-term lease was less than the prevailing market rental would be to ignore the effect of the lease on a prospective investor's judgment regarding the fair market value of the property. That was the very situation confronting the Court on the first appeal. The consideration of actual income may not be diluted by reference to the potential income of comparable property.

4. In other cases there may well be other circumstances or considerations that necessarily require adjustment to the projected actual income figure to arrive at an accurate true cash valuation. The first opinion mentioned some to illustrate that a

projected income figure arrived at by capitalization of actual income may not reflect a truly accurate picture of a property's fair market value, not as reasons to ignore the use of actual income in calculating projected income in this case.

5. The defendant's argument that this method of valuation violates the constitutional requirements of uniformity of assessment and due process begs the question. The touchstone of uniform assessment is the true cash value or usual selling price of the property. Assessment decisions must recognize limitations or restrictions which have a bearing on the selling price of property. Parcels of real property may have similar physical characteristics, but differences in economic factors will determine their usual selling price. Properties encumbered by different lease terms, zoning restrictions, or deed restrictions, although physically similar, would not have the same cash value on the open market. It would be incongruous, indeed violative of the rule of uniformity, to assess two parcels of real property the same despite the fact that the usual selling prices are different. There is no violation of the requirements of uniformity or due process in an assessment premised on true cash value as defined by the Court.

6. In failing to use actual income as the basis of its capitalization of income, the Tax Tribunal disregarded the mandate of the Court in its first decision in this case and thereby committed error. The Tax Tribunal is directed to enter a specific order forthwith using figures set forth in the Court's opinion, and put an end to this protracted litigation.

Justice Levin signed the opinion of the Court, and also wrote separately to address some of the considerations treated in the other opinions.

1. The constitutional standard is the market, "true cash value". If a desirable tenant is able, in an arm's-length bargain, to obtain more favorable terms than a less desirable tenant, the rent it pays is nevertheless the going market rate for such a tenant. If a desirable tenant obtains favorable terms, it is because that tenant is desirable; the rent it pays is the fair market value of having that desirable tenant. If another tenant pays a higher rent, it is not because the property is worth more but because the actual market value of its tenancy is of less value, due, for example, to the greater anticipated wear and tear to the property or greater financial insecurity of the tenant. In any case, what another tenant might pay is irrelevant to determining the true cash value of property encumbered by a long-term lease. The value of the property is its value as it is, *i.e.*, as encumbered. To say that its value would

be higher if it were rented to another tenant when it cannot be rented to another tenant is to deny the legal and economic reality of the encumbrance. The value of property is affected by a lease in the same manner as its value is affected by zoning or deed restrictions.

2. The argument that the lessee's interest should be valued as well as the lessor's interest is an alternative form of the argument that the property should be valued at what another, hypothetical tenant would pay: the lessee's interest is the degree to which the lease is "favorable" to him, *i.e.,* the difference between what he is paying and what the owner would presumably obtain from another tenant. Thus, valuing the lessee's interest again seeks to value the property as if it were unencumbered when it is actually encumbered. Moreover, valuing the lessee's interest would be to substitute a hypothetical rental for the rental reserved in the lease. To do so would be to eliminate all relation to actual income and thus to reverse, *sub silentio,* the first *CAF* decision. Separately valuing the lessee's interest and combining it with the lessor's interest will produce a result diametrically opposed to the original *CAF* opinion.

3. The taxing authorities should not be permitted to have it both ways—either the property is encumbered by the lease or it is not. No one could be found to buy the property for what even the owner claims it is worth unless it were "encumbered" with the K-Mart lease and the assured cash flow that goes with it. The Court cannot legitimately allow local taxing authorities or the Tax Tribunal to evaluate the property as if there is a K-Mart lease encumbrance, which alone makes it saleable at any price that would justify current assessments, and ignore the rent reserved in that lease. To ignore the lease denies the circumstances which made construction of the structure possible. The lease embodies the commitment of the lessor and the lessee to a long term of occupancy by the lessee, each thereby creating value which might not otherwise exist and forgoing other opportunities. This kind of large specialized structure would not have been constructed but for the "encumbrance" of a long-term lease from some desirable lessee. Since there would be no structure to tax without such an encumbrance, it is not appropriate to evaluate the property as if it could be rented to someone else. Cases holding that severable interests in natural aspects of the land must be assessed as part of the real estate, although separately owned, were decided pursuant to specific statutory directives and are inapposite. In them the identifiable, severable interests were clearly subject to ad valorem

taxation and the question was to whom they should be assessed, the owner of the fee or the owner of the severed interest. In this case the question is whether a leasehold is, for ad valorem tax purposes, an interest separate and apart from the fee, and, if so, to whom it should be assessed. The fee cannot be valued apart from the lessee's use and the mutual commitments of the lessor and lessee in the lease.

4. Even if it were proper to value the lessee's interest or the rental that could be obtained from another tenant, there is no probative evidence in this record which would support a valuation other than one based upon the income actually derived from the property. In reaching its result the Tax Tribunal relied on evidence of leases asserted to be comparable. The evidence of comparability in each instance was either inadequate or nonexistent. The only evidence offered was of leases in other years with other tenants or with K-Mart in other communities, all a considerable distance from Saginaw. Nor is there any basis for assuming that K-Mart would have paid in 1971 and 1975 for the lease of an 8- or 12-year-old building as much as it was then willing to pay for a brand new building located in a different community.

5. The township presented an estimate of true cash value based on the reproduction cost approach. But both of the township's witnesses testified that an existing lease had no effect on the estimate arrived at by the cost approach. The Court's first *CAF* decision requires that the long-term lease be considered and that any method of valuation which does not take into account the effect of a lease be rejected. Moreover, there was no evidence indicating that buyers and sellers of commercial property use a cost approach, in sharp contrast to evidence that buyers and sellers of commercial property use the capitalization of income approach. If buyers and sellers of commercial property do not use a technique, estimates of value derived from it have no bearing on the market price of the property, the constitutional standard.

6. The only evidence of comparable sales used in the township's market analysis is equally faulty. The witness relied on only two sales of K-Mart stores, one in 1968 and one in 1965, in the largest and second-largest metropolitan areas of the state. There is no reason to suppose that these sales of what were then almost new buildings in metropolitan areas are reliable indicators of what an 8- or 12-year-old building in Saginaw Township would sell for in 1971 or 1975. These sales values years before the tax years in question and leases of other stores built at different times in widely differing locations across the

state are not probative of what a current market rental would be for this building. When taxing authorities wish to disregard a lease, the burden is on them to come up with something better than the highly artificial evidence produced regarding rentals and sales in altogether different locations of buildings built many years apart. It was "error of law or adoption of wrong principles" for the Tax Tribunal to uphold the assessment although the taxing authorities failed to present any probative evidence to support the assessment and the lessor presented substantial unimpeached evidence.

7. Justices Moody and Williams say that the paramount consideration is unformity. Justice Moody's underlying concern appears to be that if commercial property is permitted to be assessed on the basis of actual income from a long-term lease, owners will be able to obtain a tax advantage by setting a lease rate lower than the market rate. Owners of other types of property assessed by a comparable sales or reproduction method would therefore pay a non-uniform rate when compared to commercial property owners. That concern is misplaced because no rational owner of income-producing property would choose to reduce rental income by an amount many times greater than could possibly be saved in taxes. Justice Ryan correctly points out that uniformity is achieved by adhering to the constitutional market-based standard, true cash value. If assessors adhered to that standard, all assessments would, perforce, be uniform at 50% of true cash value. Uniformity is not achieved by adhering to a single approach to valuation. The cost approach may be followed by many assessors, but since there is no real relationship between reproduction cost and value, reproduction cost has to be adjusted for economic obsolescence. That introduces a highly subjective element, one frequently responsible for the lack of uniformity in assessments. There is no guideline for economic obsolescence. Neither is uniformity advanced by attempting to assess all property which appears similar as if it were of equal value. Neither physical similarity nor reproduction cost is the standard, and any attempt to avoid the value set for the property by the market is to dilute, rather than strengthen, uniformity of assessment.

8. If there truly are a substantial number of situations in which a current rental market in excess of reserved rental creates a favorable lease from the lessee's standpoint with the consequence that the property does not support its fair share of the tax burden, the Legislature can rectify the situation by allowing local taxing authorities to tax that favorable lease to

the lessee. Similarly, the concern that a property owner will withhold income information from a tax assessor except when such information is to the owner's advantage is exaggerated. In those instances where the owner of a business also owns the property, the income derived may be more reflective of the business conducted on the property than the value of the property and therefore not a reliable indicator of the value of the property. When such information is relevant, as in the instant case, to determining the true cash value of the property, assessors may have an implied right to obtain such information under the statute which provides that income is a factor to be considered in determining the property's selling price. To the extent that the present statute is inadequate and the power to set assessments does not constitute an adequate enforcement mechanism, the Legislature, again, can provide a solution.

Justice Fitzgerald, dissenting, wrote that the Supreme Court, when it decided this case in 1974, required only that actual income be considered by the Tax Tribunal in determining true cash value; it did not require that it necessarily be used in all circumstances and certainly not that it be used exclusively. The Court set forth a non-exhaustive list of other items to be considered in addition to those listed in the statute. Another factor which may properly be taken into account here is the value of the lessee's interest in the property. The Court of Appeals misconstrued the Supreme Court's previous holding as requiring that actual income "must constitute" the basis for the valuation. Actual income, if it is relevant to determining the usual selling price, is only one of many items to be considered, and it may be rejected if it is inappropriate as applied to the facts of a particular case. The Tax Tribunal considered actual income during its proceedings upon remand and rejected its use in this case because, among other things, the relationship between the plaintiff and its tenant, and their lease were not typical of the normal market. The Tax Tribunal found that a limited number of developers for K-Mart enjoyed a favored status and that the tenant, being a highly desirable commercial tenant, could receive more favorable terms than a more marginal tenant. The Tax Tribunal was correct in rejecting the plaintiff's appraisal because it was predicated solely on the income from the lessor's interest in the property. Therefore, the Tax Tribunal sufficiently complied with the Court's previous opinion.

Justice Williams agreed with Justice Ryan that the Tax Tribunal, upon remand, by using the same assessment method,

capitalizing "market" rent instead of actual rent, directly violated the Court's first opinion in this case and that the case must be reversed and remanded again. However, he did not agree with Justice Ryan that the first opinion remanded for a determination based on actual income, that it forbade reference to potential income of comparable property, or that the actual per-square-foot rental value need only be "plugged into" a formula to arrive at projected income. The first opinion stated that "consideration" of the statutory terms does not require that the Tax Tribunal make its determination of projected income upon any one or all of the items; "consideration" may well indicate that the application of some or all items is inappropriate. The tribunal is not limited to "plugging in" actual rent because the statute requires the assessor to reach a particular result, *i.e.,* "cash value", not to apply a particular formula such as income capitalization. The assessing agency may use any accepted formula so long as it recognizes the various components of value set forth in the statute. Insofar as "economic income" is considered, that term must be interpreted as meaning actual income. Justice Williams agreed with Justice Moody as to the importance of the constitutional requirement of uniformity. But obviously, all property does not require the same assessment because all property is not the same. The resolution of the issue of the unfavorable lease and consideration of all of the statutory components of valuation of property must first be made by the assessing agency, with a rather restricted judicial review, and the case should be remanded for further proceedings.

Justice Moody dissented:

1. There is no suggestion in the Supreme Court's opinion, when it first decided this case, that actual income *must* constitute the basis for valuation. The Court held that actual income cannot be ignored and must be considered in any determination of true cash value. Consideration of the various factors may well indicate that the application of some or all enumerated factors is inappropriate. It is one thing to say that a particular item must be "considered" in terms of determining value; it is totally another thing to say that a particular item must "constitute the basis" of valuation. There is no support for the conclusion that actual income must be the starting point for calculating value. The Court has previously stated that economic or actual income is to be considered. However, the "present economic income of structures" is merely one of a number of statutory terms which must be considered in deter-

mining true cash value. While one or another of the terms may control in a given case, all terms must be considered equally.

2. The definition of economic income as actual income, and the rejection of the reproduction cost and market approaches, do not comport with the decision of any other jurisdiction in the United States which has considered the question. Other courts construing similar statutory language have applied similar analyses in cases of a property tax assessment on land encumbered by a long-term unprofitable lease. The majority of jurisdictions have concluded that where there is evidence that a long-term lease was made under distress or boom conditions which affects the actual rent, the weight to be given to the actual rent must be discounted accordingly. The effect of reliance on actual income in determining tax assessments is the destruction of the principle of uniformity in taxation; and assessment based on full, potential earning capacity is the most fundamentally fair and even-handed method of distributing the tax burden. Thus, reproduction cost and market approaches are as equally valid as the income capitalization approach in calculating true cash value of property. The effect of reliance on actual income is to give tax relief and, therefore, to subsidize the unwise businessman at the expense of the wise businessman and the other taxpayers of the state. The statutory language is sufficient to include the income which could be obtained by the proper and efficient use of the property. To hold otherwise would be to penalize the competent and diligent and to reward the incompetent or indolent.

3. While the statutory definition of true cash value contains various terms, it is without doubt that the most important element in the commercial setting is the "present economic income of structures". Economic income will almost always dictate the level of commercial property tax assessment. Thus, by defining economic income as actual income, the Court shows a rather narrow and unrealistic attitude toward property tax assessment in Michigan. Property tax by its nature is cumulative; it is a tax on every right and interest that attaches to real property. A proper assessed valuation, therefore, must include the value of all the rights which inhere in the property, including the right to current possession under a lease. Where the rent paid is less than the current market rate for the right of possession, the value of the right will increase in proportion. In order to establish the true value of land, the value of the right to receive income, the lessor's interest, must be combined with the value of the right of possession, the lessee's interest. Because the Court's prior decision focuses only on the lessor's

right to receive income under the lease, a distorted view of the true cash value results. And, while it is true that any sale of the lessor's interest in the property would reflect the unfavorable lease, a sale of the lessee's interest would result in a rate of return which would be much higher than the relatively low rental expense would suggest. By a similar analysis, the Tax Tribunal attempted to ascertain the true cash value of the plaintiff's property, *i.e., a combination of the lessor's interest and the lessee's interest in the property.* Such an approach is eminently fair and sensible. It truly endeavors to ascertain the "usual" selling price of the property, as mandated by the Legislature.

4. Actual income is a very limited tool in determining property tax assessment, and its use creates procedural difficulties for the taxing authorities. In addition, the class of taxpayers who are capable of making use of the actual income method is extremely limited. It is clear from testimony in the Tax Tribunal hearing that under normal circumstances the majority of taxpayers in Michigan have their property assessed by the reproduction cost approach. Only income-producing property can be assessed by use of the income capitalization approach. But even then, only when it is to the advantage of the taxpayer will the necessary information be supplied to the assessor to use the income capitalization approach for tax assessment purposes. Under this method, because there is no law that requires the taxpayer to supply this information to the tax assessor, the ability to control and manipulate the property tax assessment rests in the hands of the taxpayer alone. If the Legislature wanted actual income to be the method or basis for property tax assessment, it would have provided some independent means for the assessor to ascertain actual income. Also, it is highly unlikely that the Legislature would make such a definition for the present economic income of structures when only a limited segment of a class of taxpayers would be affected by it, particularly in view of the constitutional requirement of uniformity in property tax assessment.

5. The framers of the Constitution of 1963 considered uniformity of taxation the paramount goal of all property tax assessments. This principle requires neither mathematical equality nor matematical certitude. What is required is that similar properties within the same district be assessed on a similar basis. However, even very similar parcels of land may possess differing attributes which may lead to a disparity in tax assessment. The disparity in assessment may not constitute a violation of the principle of uniformity of treatment, but it may

indicate that something is amiss. The plaintiff contends that the encumbrance on this property of a long-term unprofitable lease should form the basis for any assessment of its value. But another parcel with similar structures not encumbered by a long-term unprofitable lease would bear a considerably greater tax burden because it would be assessed by the reproduction cost method, as is most of the property in the state, rather than by the use of actual income. A disparity clearly exists here, but it is not the result of any innate differences between this property and a hypothetical property which is similar but unencumbered by the plaintiff's lease. The disparity results because one taxpayer has saddled his property with such a lease, while another taxpayer has reaped a profit from his land. To allow business acumen of the taxpayer to form the controlling basis of property tax assessment would obliterate the principle of consistency. In addition, it would permit a taxpayer to manipulate the taxing process for his own purposes, regardless of what happens to the rest of the property owners of the state. It can hardly be said that the framers of the Constitution or the Legislature intended such a result. Valid limitations on the use of land may exist which will lead to disparate valuations of similarly situated properties. No violation of the doctrine of uniformity occurs where the tax assessors take such limitations into account. However, in each case the limitation was imposed on the property by the actions of a third party. In no case have the courts of Michigan sanctioned a limitation which was imposed on the property by the property owner.

6. If the Legislature intended the term "present economic income of structures" to mean "actual income", it has created an arbitrary and irrational classification that cannot be sustained on equal protection and uniformity grounds. There can be no uniformity of taxation if a special group of taxpayers can claim that property tax must be based on the actual income derived from a self-imposed, unfavorable lease.

7. The Tax Tribunal, on remand, did consider actual income in evolving its assessment. It was not required to base its valuation on that factor to the exclusion of any other consideration. Because the Tax Tribunal properly determined the true cash value of the property owned by the plaintiff its assessment should be sustained.

79 Mich App 559; 262 NW2d 863 (1977) affirmed.

### Opinion of the Court

1. Judgment — Appeal — Law of the Case.

A question of law decided by an appellate court will not be

differently decided on a subsequent appeal in the same case where the facts remain materially the same.

2. JUDGMENT — APPEAL — LAW OF THE CASE.

A ruling of the Supreme Court in a case becomes the law of the case to govern a new trial and is not subject to review thereafter; if it is claimed that the conclusions of law reached on the former hearing were erroneous, the remedy is by a motion for a rehearing.

3. TAXATION — PROPERTY TAX — VALUATION — ECONOMIC INCOME — ACTUAL INCOME — LONG-TERM LEASE.

Economic income of real property, as used in the General Property Tax Act, means actual income where the property was rented for use as a retail store under a long-term lease which fairly reflected economic circumstances at the outset of its term, and there was no suggestion that the lease was made other than by arm's-length negotiations; the fact that actual income was less than the rate of return on comparable property under current market conditions does not require valuation of the property based on the income which it was capable of producing at the prevailing rate in the current market (MCL 211.27; MSA 7.27).

4. TAXATION — PROPERTY TAX — ECONOMIC INCOME — ACTUAL INCOME — WORDS AND PHRASES.

"Economic income" is nothing other than the actual income of real property in a case where rental received under a long-term lease of the property reflected current economic circumstances and bore a demonstrable relationship to true cash value (MCL 211.27; MSA 7.27).

5. TAXATION — PROPERTY TAX — VALUATION — INCOME CAPITALIZATION.

The Tax Tribunal, in using the income capitalization approach to valuation of property, is not limited to the actual rental under an existing long-term lease as the sole measure of projected income and basis for capitalization; projected actual income may be adjusted for any relevant factors which are necessary to arrive at a valuation reflecting the true cash value of the property (MCL 211.27; MSA 7.27).

6. TAXATION — PROPERTY TAX — ASSESSMENT — UNIFORMITY — TRUE CASH VALUE.

The touchstone of uniform assessment is the true cash value or usual selling price of the property; however, assessment decisions must recognize limitations or restrictions which have a

bearing on the selling price of property (Const 1963, art 9, § 3; MCL 211.27; MSA 7.27).

7. TAXATION — PROPERTY TAX — VALUATION — TRUE CASH VALUE.
   Parcels of real property may have similar physical characteristics, but differences in economic factors will determine the usual selling price of the parcels; physically similar properties encumbered by different lease terms, zoning restrictions, or deed restrictions would not have the same cash value on the open market (Const 1963, art 9, § 3; MCL 211.27; MSA 7.27).

8. TAXATION — PROPERTY TAX — VALUATION.
   It would violate the rule of uniformity in taxation to assess two parcels of real property the same despite the fact that their usual selling prices are different (Const 1963, art 9, § 3; MCL 211.27; MSA 7.27).

SEPARATE OPINION BY LEVIN, J.

9. TAXATION — PROPERTY TAX — ASSESSMENT — LONG-TERM LEASE — ACTUAL INCOME.
   *The constitutional standard for valuation of real property is the market, "true cash value"; if a desirable tenant is able, in an arm's-length bargain, to obtain more favorable terms than a less desirable tenant, the rent it pays is nevertheless the going market rate for such a tenant, and what another tenant might pay is irrelevant to determining the true cash value of property encumbered by a long-term lease (Const 1963, art 9, § 3; MCL 211.27; MSA 7.27).*

10. TAXATION — PROPERTY TAX — ASSESSMENT — LONG-TERM LEASE.
    *Valuing the lessee's interest as well as the lessor's interest in assessing real property subject to a long-term lease is an alternative way of valuing the property at what another, hypothetical, tenant would pay, because the lessee's interest is the degree to which the lease is "favorable" to him, i.e., the difference between what he is paying and what the owner would presumably obtain from another tenant, and thus seeks to value the property as if it were unencumbered by the lease when it is actually encumbered (MCL 211.27; MSA 7.27).*

11. TAXATION — PROPERTY TAX — ASSESSMENT — LONG-TERM LEASE.
    *Cases holding that severable interests in natural aspects of land must be assessed as part of the real estate although separately owned, pursuant to statute, are inapposite in a case where the question is whether a leasehold is, for ad valorem tax purposes, an interest separate and apart from the fee, and, if so, to whom*

*it should be assessed; the fee cannot be valued apart from the
lessee's use and the mutual commitments of the lessor and
lessee reflected in the lease (MCL 211.27; MSA 7.27).*

12. TAXATION — PROPERTY TAX — ASSESSMENT — EVIDENCE.

   *When taxing authorities wish to disregard a long-term lease to
   which the commercial real property being assessed is subject
   and use some method other than capitalization of actual in-
   come, the burden is on them to come up with something better
   than highly artificial evidence regarding rentals and sales in
   altogether different locations of buildings built many years
   apart (MCL 211.27; MSA 7.27).*

13. TAXATION — PROPERTY TAX — ASSESSMENT — UNIFORMITY.

   *Uniformity of assessment is achieved by adhering to the constitu-
   tional market-based standard, true cash value; if the cost
   approach to assessment is used, since there is no real relation-
   ship between reproduction cost and value, reproduction cost
   has to be adjusted for economic obsolescence, a highly subjec-
   tive element frequently responsible for the lack of uniformity
   in assessments (Const 1963, art 9, § 3; MCL 211.27; MSA 7.27).*

14. TAXATION — PROPERTY TAX — ASSESSMENT — UNIFORMITY.

   *Uniformity of assessment is not advanced by attempting to assess
   all property which appears similar as if it were of equal value
   (Const 1963, art 9, § 3; MCL 211.27; MSA 7.27).*

DISSENTING OPINION BY FITZGERALD, J.

15. TAXATION — PROPERTY TAX — TRUE CASH VALUE — ACTUAL
   INCOME.

   *Actual income produced by real property, if it is relevant, must
   be considered in determining the true cash value of the prop-
   erty under the General Property Tax Act, but it need not
   necessarily be used in all circumstances and certainly should
   not be used exclusively; it may be rejected, after consideration,
   if it is inappropriate as applied to the facts of a particular case
   (MCL 211.27; MSA 7.27).*

16. TAXATION — PROPERTY TAX — TRUE CASH VALUE — LESSEE'S
   INTEREST.

   *Among the items which may properly be taken into account in
   determining the true cash value of real property under the
   General Property Tax Act, in addition to the items mentioned
   in the statute, is the value of the lessee's interest in the
   property (MCL 211.27; MSA 7.27).*

17. Taxation — Property Tax — True Cash Value — Actual
    Income — Long-Term Lease.

*The Tax Tribunal correctly considered and rejected an appraisal
of real property which was predicated solely on the income
from the lessor's interest in the property where it found that
the relation between the owner of the property and its tenant
were not typical of the normal market, and that the particular
tenant, being a highly desirable commercial developer of dis-
count stores, could receive more favorable lease terms than a
more marginal tenant (MCL 211.27; MSA 7.27).*

Concurring and Dissenting Opinion by Williams, J.

See headnotes 1, 2, 5, 23, 27.

18. Taxation — Valuation — Law of the Case.

*Use by the Tax Tribunal, upon remand by the Supreme Court, of
a capitalization of "market" rent of property with a long-term
unfavorable lease instead of the actual rent under the lease
must be reversed where that use directly violated the Court's
previous opinion in the matter (MCL 211.27; MSA 7.27).*

19. Taxation — Valuation — Capitalization of Income.

*The General Property Tax Act requires "consideration" by the
assessing body of the items listed in the statute but does not
require that the assessing body make its determination of
projected income of property upon any one or all of the items;
"consideration" may well indicate that the application of some
or all of the items is inappropriate in a certain case (MCL
211.27; MSA 7.27).*

20. Taxation — Valuation — Cash Value — Capitalization of
    Income.

*The General Property Tax Act requires the assessor to reach a
particular result, i.e., "cash value", not to apply a particular
formula of valuation; the assessor is not limited to "plugging
in" actual rent to capitalize income but may use any accepted
formula so long as it recognizes the various components of
value set forth in the statute (MCL 211.27; MSA 7.27).*

21. Taxation — Economic Income — Actual Income — Words and
    Phrases.

*The term "economic income", insofar as it is considered by the
assessor in valuing property under the General Property Tax
Act, must be interpreted as meaning actual income (MCL
211.27; MSA 7.27).*

22. TAXATION — ASSESSMENT — LONG-TERM LEASE.

The issue of the valuation of property with an unfavorable long-term lease and consideration of the statutory items for valuation of property under the General Property Tax Act must first be addressed by the assessing body, with rather restricted judicial review (Const 1963, art 6, § 28; MCL 211.24, 211.27, 211.151; MSA 7.24, 7.27, 7.210).

DISSENTING OPINION BY BLAIR MOODY, JR., J.

23. TAXATION — PROPERTY TAX — VALUATION — ECONOMIC INCOME — ACTUAL INCOME.

Actual income of structures cannot be ignored and must be considered in any determination of true cash value of real property, under the General Property Tax Act; however, the present economic income of structures is merely one of a number of statutory terms which must be considered in determining true cash value, and while one or another of the terms may control in a given case, all terms must be considered equally (MCL 211.27; MSA 7.27).

24. TAXATION — PROPERTY TAX.

Property tax by its nature is cumulative; it is a tax on every right and interest that attaches to real property; a proper assessed valuation, therefore, must include the value of all the rights which inhere in the property.

25. TAXATION — PROPERTY TAX — VALUATION — TRUE CASH VALUE.

The right to current possession of real property under a lease is a right which inheres in the property, and if the rent paid for the right to possession is less than the current market rate, then the value of the right of current possession will increase in proportion; therefore, in order to establish the true value of the land in determining the property tax assessment, the value of the right to receive income, the lessor's interest, must be combined with the value of possession, the lessee's interest (MCL 211.27; MSA 7.27).

26. TAXATION — PROPERTY TAX — ASSESSMENT — CAPITALIZATION OF INCOME — ACTUAL INCOME.

Actual income produced by real property is a very limited tool in determining property tax assessment and its use creates procedural difficulties for taxing authorities; if the Legislature had wanted actual income to be used for assessment by capitalization of income, it would have provided some independent means for the assessor to ascertain actual income, but it is highly unlikely that the Legislature would define the "present

*economic income of structures" to be actual income when only a limited class of taxpayers would be affected by it (MCL 211.27; MSA 7.27).*

27. Taxation — Property Tax — Uniformity — Constitutional Law.

*The framers of the Constitution of 1963 considered uniformity of taxation the paramount goal of all property assessments (Const 1963, art 9, § 3).*

28. Taxation — Property Tax — Assessment — Uniformity — Constitutional Law.

*The principle of uniformity of taxation requires neither mathematical equality nor mathematical certitude; what is required is that similar properties with the same district be assessed on a similar basis, and if this is done, the actual amount of taxes to be paid on such property will be the same (Const 1963, art 9, § 3).*

29. Taxation — Property Tax — Assessment — Uniformity — Constitutional Law.

*Even very similar parcels of land may possess differing attributes which may lead to a disparity in tax assessment, but that may not in itself constitute a violation of the principle of uniformity of taxation (Const 1963, art 9, § 3).*

30. Taxation — Property Tax — Assessment — Limitations on Use.

*Valid limitations on the use of land may exist which will lead to disparate valuations of similarly situated properties, but in each case where such a limitation has been recognized it has been imposed by a third party, not by the property owner himself (MCL 211.27; MSA 7.27).*

31. Taxation — Property Tax — Economic Income — Actual Income — Long-Term Lease — Equal Protection — Uniformity.

*The Legislature, if it intended the term "present economic income of structures" as used in the General Property Tax Act to mean "actual income", has created an arbitrary and irrational classification that cannot be sustained on equal protection and uniformity grounds; there can be no uniformity of taxation if a special group of taxpayers can claim that property tax must be based on the actual income derived from a self-imposed, unfavorable lease, especially where a taxpayer may choose whether to reveal the actual income and thereby require its use to*

control assessment valuation (US Const, Am XIV; Const 1963, art 1, § 2; Const 1963, art 9, § 3; MCL 211.27; MSA 7.27).

*Honigman, Miller, Schwartz & Cohn* (by *Charles H. Tobias* and *Michael B. Shapiro)* for plaintiff.

*Crane, Kessel & Crane* for defendant.

RYAN, J. We address a conflict which has a long and protracted history arising out of Saginaw Township's 1971 tax assessment of appellee's property. The original dispute between the parties was initially resolved by this Court in 1974 in a unanimous opinion written by Justice FITZGERALD. *CAF Investment Co v State Tax Comm,* 392 Mich 442; 221 NW2d 588 (1974). The Court reversed the decision of the tax commission and remanded to the Tax Tribunal[1] for proceedings consistent with the opinion.

The Tax Tribunal thereafter conducted two weeks of hearings culminating in a lengthy opinion dated April 5, 1976. On appeal as of right to the Court of Appeals, the Tax Tribunal was again reversed and the case was remanded for redetermination. The Court of Appeals concluded that the tribunal failed to follow the dictates of this Court's earlier decision. *CAF Investment Co v Saginaw Twp,* 79 Mich App 559; 262 NW2d 863 (1977).

We have again granted leave to appeal. 403 Mich 801 (1978).

I

The facts giving rise to this dispute are exten-

---

[1] During the course of the appeal, the Legislature enacted the Tax Tribunal Act which transferred jurisdiction over property tax appeals from the tax commission to the Tax Tribunal. MCL 205.701 *et seq.;* MSA 7.650(1) *et seq.*

sively stated in our prior decision and need not be repeated at length here.

It suffices to say that C.A.F. disagrees with Saginaw Township's assessed valuation of commercial property owned by the company. The property is encumbered by a long-term lease with the S.S. Kresge Company for a K-Mart store. The lease is not expected to expire until 1998 if available options are exercised. Under the economic conditions for the assessment years now in dispute, 1971-1975, actual income under the lease is relatively low. Expert witnesses for both parties conceded, however, that the lease fairly reflects 1963 economic conditions, the year the lease was made.

When this case was here before, C.A.F. was challenging Saginaw Township's true cash valuation of $1,442,364 for the subject property.[2] That

[2] "True cash value" is the basis for the uniform general ad valorem taxation of real property. Const 1963, art 9, § 3. The Legislature, during the period in question, defined "true cash value" in MCL 211.27; MSA 7.27, to mean, in essence, the "usual selling price" of such property on the open market, taking into account various other factors, including the "present economic income of structures".

MCL 211.27; MSA 7.27 provided in pertinent part:

" 'Cash value' means the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale. Any sale or other disposition by the state or any agency or political subdivision of lands acquired for delinquent taxes or any appraisal made in connection therewith shall not be considered as controlling evidence of true cash value for assessment purposes. In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, zoning, existing use, present economic income of structures, including farm structures and present economic income of land when the land is being farmed or otherwise put to income producing use, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available therein and their value.

"Except as hereinafter provided, property shall be assessed at 50% of its true cash value in accordance with article 9, section 3 of the constitution." 1973 PA 109.

This section has since been amended by 1976 PA 293, § 1; 1976 PA 411, § 1; and 1978 PA 25, § 1.

determination had been appealed to the State Tax Commission which essentially sustained the township's earlier assessment. In making that decision, the tax commission relied heavily upon the testimony of Norman Daniels, a staff appraiser. Daniels had submitted a true cash valuation of $1,600,-000 based upon both the capitalization of income and the depreciated reproduction cost methods of appraisal. The basis for Daniels' calculation of capitalized income value was a projection of the expected 1971 rental return for comparable property. Reduced to its simplest terms, this represented an "economic rental" value, of $2.00 per square foot based upon the operations of similar K-Mart properties.[3] Implicit in the valuation was that the property was then available to rent in the marketplace, which of course was not the case.

On appeal to this Court, C.A.F. contended that "true cash value", as defined by statute, could only be determined by reference to the actual income realized under the terms of the lease with S.S. Kresge. Basing his calculations of capitalized income value on actual income, the C.A.F. appraiser, Dean Nelson, arrived at a valuation of $787,500. C.A.F. contended that this figure accurately reflected true cash value. The tax commission's reliance upon an "economic rental" or "hypothetical income" as a basis for appraisal, C.A.F. argued, had no reasonable relationship to the usual selling price or fair market value of the property which is the constitutional and statutory standard for determining true cash value.

The tax commission defended its valuation by pointing out that C.A.F.'s actual rental figures under the lease resulted in an unreasonably low

---

[3] The terms "economic rental", "hypothetical rental income", "potential income/rent", and "rate of return on comparable property" are used interchangeably throughout this opinion.

capitalized valuation. The tax commission equated the statutory language "economic income" with the appraisal term "economic rental". Thus, the tax commission contended that if property is leased under a long-term lease for a rental which in later years proves unduly low in the face of economic changes, actual rent could be ignored and the potential rental income of the property on the open market could be utilized.

Justice FITZGERALD incisively framed the issue presented to this Court as follows:

"[W]hether, under Michigan law, the tax commission was entitled to consider and give weight to evidence of valuation based upon a rate of return which comparable, unencumbered property could earn in the present marketplace in the face of an existing unfavorable long-term lease with an actual rate of return which is substantially less than the present 'going rate'." 392 Mich 442, 447.

This Court held that under the circumstances of the case presented, the answer was, "No". It was held that, as used in the statute, "economic income" meant "actual income". *Id.,* 454. To the extent that the capitalization of income method is used for determining true cash value, the assessor was obligated to use the actual income under the existing long-term lease as the basis for his calculations. *Id.* The record indicated that the lease was the product of an arm's-length transaction and fairly reflected economic conditions at the outset. To the extent that the tax commission permitted actual income to be ignored, the township's valuation was clearly in error. A hypothetical rental income based on comparable properties leased at more favorable rates was an improper basis for determining true cash value. *Id.,* 455.

This Court reversed the tax commission and remanded for a determination of true cash value based upon actual income. Due to a procedural error also committed by the tax commission, a full *de novo* hearing was held by the Tax Tribunal.

Not surprisingly, evidence developed at the hearing on remand essentially mirrored that taken at the original hearing. The C.A.F. appraiser, Dean Nelson, testified on behalf of C.A.F. and again arrived at a 1971 assessed valuation of $787,500 by capitalizing actual income under the existing long-term lease. Nelson expanded his appraisal to cover the intervening years to 1975. The highest valuation under his calculations was $950,-500 for the assessment year 1974. These figures, according to Nelson, represented the fair market value of the property to a commercial investor. Nelson opined that investors would look at the cash flow under the existing lease to determine the fair market value of the property.

Norman Daniels again testified on behalf of the township. His testimony and appraisal were corroborated by a fellow tax commission appraiser, Russell Galvin. Both testified that the most reliable method of determining the fair market value of the property was by the capitalization of income method. Two alternative methods of valuation were utilized to check the validity of the capitalization of income method.[4] Both witnesses determined that the valuations for the assessment years in question were as follows: $1,509,000 in 1971;

[4] It should be noted that our prior decision left open the prospect of utilizing other appraisal methods to determine true cash value in the appropriate circumstances. See 392 Mich at 450, fn 2. It was the unanimous opinion of the appraisers in the instant case that the capitalization of income method reflected the most accurate and reasonable assessment of fair market valuation and it is that method, therefore, which is the proper basis for the tribunal's assessment.

$1,570,000 in 1972; $1,640,000 in 1973; $1,705,000 in 1974; and $1,771,000 in 1975.

Daniels and Galvin testified that these figures reflected the true cash value of the entire property and not just the value of the lessor's interest under the lease as reflected by use of actual rental income alone as suggested by the C.A.F. appraiser. On cross-examination both experts explained that, in essence, this meant that they looked to the hypothetical rental income of the subject property to make their calculations and ignored actual rent received under the lease. They even went so far as to say that to determine the total value of the subject property, actual rent received was irrelevant. Daniels admitted that with the exception of a change in the vacancy factor, there was no difference between the first appraisal submitted originally to the tax commission and the second appraisal provided to the Tax Tribunal at this hearing.

After taking the above testimony the Tax Tribunal made supplemental findings of fact, none of which are pertinent to the resolution of the present appeal.[5] The Tax Tribunal then framed the

[5] The Tax Tribunal developed the following additional facts and circumstances at the hearing on remand:

"1. At the time of the initial assessment in 1971, that triggered this appeal, petitioner refused to provide the appraisal firm that reappraised all the property in the assessment district with the income and expense data on which this appeal is based.

"2. During this hearing petitioner, represented by counsel only at the hearing, objected to the introduction of the mortgage and to petitioner's balance sheet for December 31, 1966, which were both introduced by respondent as its Exhibits No. 11 and 13, respectively, which were admitted as evidence.

"3. The balance sheet (respondent's Exhibit 13) indicated the total cost of subject property was $1,057,318.88, while the mortgage (respondent's Exhibit 11) indicated petitioner was loaned $1,250,000 on subject property on November 15, 1963, or for a mortgage loan of $192,681 in excess of cost. Petitioner offered no explanation for this excess.

"4. That there are only three or four developers in the country who

legal issue which it deemed necessary for it to resolve in the dispute presented: "Where real property is subject to a long-term lease which currently provides less than the normal market rent, is such property to be assessed on a value predicated on the actual level of income?"

After a lengthy statutory analysis, the Tax Tribunal essentially reaffirmed the tax commission's earlier assessment of the C.A.F. property. With modification to the capitalization rates and expense figures, the Tax Tribunal predicated the value of the property on the capitalization of income method of appraisal as employed by the tax commission appraiser, Norman Daniels. Market rent in lieu of actual income was utilized to

have been able to develop 'K-Mart' properties. There was no adequate explanation offered as to why this was so.

"5. That S.S. Kresge Company is a very desirable 'Triple AAA' [sic] tenant from an economical standpoint.

"6. That petitioner's appraiser, in making his appraisal predicated on lease rental income only, did so on instructions of petitioner.

"7. One of respondent's witnesses, a Level IV certification appraiser for the State Tax Commission, spent eight weeks preparing the appraisal on this property utilizing a market rent income valuation approach.

"8. That assessors cannot compel taxpayers to furnish income and expense data for use in appraising on an income valuation method.

"9. That assessors can only obtain such data from those that are willing to give it.

"10. That both petitioner's and respondent's appraisers made appraisals for the tax years 1971 and 1975, respectively, and at the request of the tribunal prepared and testified to estimates of value for the intervening 1972, 1973 and 1974 tax years.

"11. That petitioner's appraiser had not prepared an appraisal based on the 'cost' or 'market' approach on the grounds that the income method was the best method and that in utilizing the lease rental income in lieu of market rent in 1975 he was acting on instructions of his client, the petitioner.

"12. Respondent's other expert witness appraiser prepared a 'cost' and 'market' approach appraisal for 1971 but, together with respondent's first expert witness who prepared the 'income' method appraisal, agreed that the 'income' method was the best method to be used with the subject property provided that the value could not be predicated on the lease rental income alone when such income is substandard compared to market rent and that in this case 'market rent' was used by them in valuing the property."

reach a valuation of $1,389,452 for the assessment years 1971-1974. The 1975 assessment year valuation was determined to be $1,473,506.

Emphasized throughout the opinion was the Tax Tribunal's belief that the Legislature did not intend the use of actual income to determine true cash value when that figure represented only a portion of the commercial income potential of the property involved. The appraisal submitted by C.A.F. appraiser Dean Nelson, consisting of a capitalization of actual income under the long-term lease, was considered to be "of little, if any, evidentiary value". The foremost reason for its rejection was the appraisal's failure to predicate valuation on "the amount of income the subject property is capable of producing".

The Court of Appeals reversed the decision of the Tax Tribunal and again remanded. The Court reasoned that our prior decision required that capitalization of *actual* income form the basis of the tribunal's calculations and held that by ignoring actual income and adopting the appraisal based upon the rate of return of *comparable* unencumbered property, the Tax Tribunal committed a clear error of law. *CAF Investment Co v Saginaw Twp,* 79 Mich App 559, 546-565; 262 NW2d 863 (1977).

On appeal, Saginaw Township contends that the Court of Appeals misconstrued our earlier decision; that our decision did not require the valuation of C.A.F.'s property to be based *solely* on actual rent; that actual rent need only be considered along with other relevant factors; and that if in light of unusual circumstances actual income did not reflect the true cash value of the entire property, actual income could be properly disregarded. The township also argues that to predicate

valuation on the actual income received under a long-term lease allows a taxpayer to effectively "freeze" his real estate tax assessment against future inflation of land values which violates the constitutional requirement of uniformity of assessment.

C.A.F. responds that the Court of Appeals applied the law of the case to the Tax Tribunal decision and correctly found it to be inconsistent; that the only appraisal which conformed with the principles of true cash value mandated by our prior decision was Dean Nelson's; and that the Tax Tribunal's partial reliance upon an appraisal based on hypothetical income was in clear conflict with our prior decision.

## II

The law of the case doctrine dispenses with the need for this Court to again consider legal questions determined by our prior decision and necessary to it. As generally stated, the doctrine is that if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same. *Corporation & Securities Comm v American Motors Corp,* 379 Mich 531; 152 NW2d 666 (1967); *Palazzolo v Sackett,* 254 Mich 289; 236 NW 786 (1931); *American Ins Co of Newark v Martinek,* 216 Mich 421; 185 NW 683 (1921); *Allen v Michigan Bell Telephone Co,* 61 Mich App 62; 232 NW2d 302 (1975); *Topps-Toeller, Inc v Lansing,* 47 Mich App 720; 209 NW2d 843 (1973).

The application of this principle was recognized early in the judicial history of this state. In *Pierce*

*v Underwood,* 112 Mich 186-187; 70 NW 419 (1897), Justice MONTGOMERY stated:

"This case was before the court at a former term, and is reported in 103 Mich 62 [61 NW 344], to which reference is made for a statement of the facts. The case has been retried at the circuit, and has resulted in a verdict and judgment in favor of the plaintiff. The brief of the appellant raises the same questions which were discussed in the former case and reargues them. We cannot review the questions which were there disposed of. If it is claimed that the conclusions of law reached on the former hearing were erroneous, the remedy is by a motion for a rehearing, but a ruling of this court in a case becomes the law of the case to govern a new trial, and is not subject to review thereafter."

The controlling facts in the instant dispute remain virtually identical with those which obtained when we decided this dispute the first time, other than the extension of the valuations through 1975. The appraisals submitted by the parties at the hearing on remand, in essence, utilized the same methods of valuation and arrived at virtually the same determinations of true cash value as before. The issues framed by the township on this appeal are nothing more than polemic restatements of the question decided on prior appeal.

Determinative in the present appeal is the Tax Tribunal's reliance on the appraisal of Norman Daniels which substituted the economic rental or hypothetical income for the actual rent of the subject property under the long-term lease, despite this Court's prior rejection of that criterion as a proper basis of valuation. The cross-examination of Daniels at the hearing on remand was, in part, as follows:

"*Q.* Well, but isn't it true, Mr. Daniels, that in

arriving at total value in this case, the actual rent received from K-Mart was irrelevant?

"*A.* What's that again?

"*Q.* In arriving at total value, wasn't the actual rent received by C.A.F. from K-Mart irrelevant?

"*A.* In valuing the total property value, yes.

"*Q.* Yes, it was irrelevant?

"*A.* Yes.

"*Q.* So if you had not considered any actual rent at all, you would have come out exactly the same in your total value?

"*A.* In valuing the fee simple estate, yes."

The Tax Tribunal's acceptance of Daniels' appraisal based on the use of hypothetical income is evidenced by its adoption of the $2.00 per square foot rental income figure used by Daniels as opposed to the $1.30 per square foot actual rental figure. The error in basing valuation upon the rental value of comparable property was clearly stated by Justice FITZGERALD in our prior decision:

"The State Tax Commission's ultimate determination of true cash value of $1,440,000 is based in part upon the testimony of Norman Daniels on 'economic income' capitalization. To the extent it is based upon such evidence, the ultimate valuation relies upon a hypothetical rental income *without consideration* of actual rental income demonstrably related to fair market value. Such a valuation does not comport with the constitutional and statutory standard of 'true cash value'." 392 Mich at 454-455.

Remarkably, the Tax Tribunal is guilty of the same error for which we reversed the tax commission previously. It was presumptuous for the Tax Tribunal to embark upon a legal analysis of a question that was clearly presented to and decided by this Court on prior appeal. The Tax Tribunal's

division of the C.A.F. property into "leased fee" and "leasehold" interests for purposes of establishing the true cash value of the "entire" property is an inappropriate subterfuge to justify the tribunal's determination to reject the use of actual income when it falls below the potential rental value of comparable properties currently on the market, and is unwarranted. The tax commission was reversed by this Court in our prior decision for its use of hypothetical income rather than actual income to reach a projected income figure. In its decision on remand, the tribunal has attempted to justify essentially the same method of valuation. In fact, the Tax Tribunal used the same "economic rental" figure of $2.00 per square foot supplied by Norman Daniels that the tax commission had employed in its calculations. We hold once again that such a method of valuation is erroneous.

The Tax Tribunal's reasoning upon remand, and the township's argument on appeal, is that our prior decision required only that actual income be "considered" in determining true cash value and that once it had given "consideration" to actual income and determined that it did not accurately reflect current rates of return of comparable property on the open market, actual income could be ignored.

The Tax Tribunal's estimation of the significance this Court placed on actual income in this dispute falls woefully short of the mark.[6] All the

_____

[6] It is contended by the township and Justices FITZGERALD and MOODY that when we directed the Tax Tribunal to "consider" actual income in our previous opinion, 392 Mich 456, fn 6, we required only that the tribunal think about using actual income as the basis of its calculation, with the option to disregard it if it so chose. The contention is untenable. To construe "consider" in that manner is manifestly illogical since the Tax Tribunal (then the tax commission) had received into evidence at the *first* hearing, the one reviewed in our

appraisers testified that the capitalization of income method was the best indication of value. Commercial investors rely heavily upon cash flow represented by the capitalization of actual income to judge the fair market value of property. Having chosen that method of valuation, consideration of "economic income" as provided by statute was imperative. Our prior decision left no doubt that "economic income" meant nothing other than actual income *under the circumstances of this case.* *CAF Investment Co v State Tax Comm, supra,* 454. We said as much: "[I]n this case the record indicates that long-term lease rental fairly reflects economic circumstances at the outset of the lease term and bears a demonstrable relation to true cash value". *Id.,* 456, fn 6. Other than the fact that actual income was less than the rate of return comparable property might receive under current market conditions, there was no suggestion that the lease was arrived at other than by arm's-length negotiations.

### A

A calculation under the capitalization-of-income method yields a projected income figure. Often, as here, that figure alone will reflect the fair market value of the property. Saginaw Township and the Tax Tribunal have maintained throughout the

previous opinion, the testimony of Dean Nelson, the C.A.F. appraiser, who maintained that the true cash value of the property in question must be determined with reference to actual income. Patently, when we ordered the Tax Tribunal to "consider" actual income it had already thought about, and rejected, its use. Indeed, we quoted the tribunal's recognition that its valuation of the property "was arrived at after *'consideration* of all the information contained [in the noted facts]' ". 392 Mich 447 (quoting the Tax Tribunal) (emphasis added; brackets in original). Against this backdrop it is plain that the tribunal had considered actual income when we ordered it to "consider" the same. In this context, the only reasonable interpretation of "consider" is "use".

course of these proceedings, however, that pro-
jected income, as reflected by the capitalization of
actual income received under the long-term lease,
does not reflect the true cash value of the entire
property. Instead, they argue, any projected in-
come figure calculated on the basis of actual in-
come values only the lessor's (C.A.F) interest in
the property and ignores the lessee's (K-Mart)
interest under the lease, and that the lessee has a
measurable interest in the land due to the eco-
nomic advantage it enjoys by renting property for
an amount that is less than the prevailing rate in
the current market.

Whatever merit that proposition might have in
the science of real estate appraisal, consideration
of a so-called lessee's interest by the means em-
ployed by the Tax Tribunal is foreclosed by our
prior decision. Testimony of the tax commission
experts was that in order to value the entire
property, consisting of both the lessor's and les-
see's interest, anytime actual income fell below the
market rent or hypothetical income of comparable
property actual income would be ignored, and it
was ignored in this case for that very reason.

The fault of this methodology is that true cash
value must equal the fair market value of the
property to the owner. All experts conceded that
economic income most accurately reflected that
value. And, on the facts before us, economic in-
come was nothing other than actual income, since
it had been determined that for the years in
question the lease rental reflected current eco-
nomic circumstances and bore a demonstrable re-
lation to true cash value. Moreover, to equate
economic income with hypothetical income in ev-
ery situation where actual rent under a long-term
lease is less than the prevailing market rental

would be to ignore the effect of the lease on a prospective investor's judgment regarding the fair market value of the property. That was the very situation confronting this Court on prior appeal. We refused to allow the consideration of actual income to be diluted by reference to the potential income of comparable property then, and we do so now.[7]

B

In other cases there may well be other circumstances or considerations that necessarily require adjustment to the projected actual income figure to arrive at an accurate true cash valuation. These were mentioned in our prior decision and apparently were a source of the tribunal's confusion on remand. Justice FITZGERALD stated in 392 Mich at 455-456:

"By the holding *in this case,* we do not mean to suggest that the tax assessor, in utilizing the income capitalization approach to valuation, is limited to, and must accept, the actual rental figure under an existing long-term lease as the sole measure of projected income and basis for capitalization. In most cases such an approach to true cash value would lead to distorted valuation. Such factors as the right to repossession of the land at the end of the lease, and the length of the lease term often suggest that the projected income figure should at least in part be adjusted to reflect current market conditions. It may also be appropriate to adjust the projected income figure in circumstances where financing was obtained at a much more favorable rate than the current going rate, and there is a high

[7] It should be noted that the appraiser for C.A.F. did adjust the capitalization rate to reflect the owner's reversionary interest under the lease. The Tax Tribunal presumably acknowledged the validity of providing for the valuation of that interest by such an adjustment by further modifying the capitalization rate before employing it in their calculations of projected income.

current rate of capitalization, in order to reflect the fact that the income-earning capacity of the property is greater than consideration of the unfavorable long-term lease rental at current capitalization rates would alone suggest. Furthermore, we can envision circumstances in which it may be inappropriate to consider lease term rental as a component of projected income. Finally, there may be such facts, peculiar to the circumstances under consideration, as would indicate that the income capitalization approach is too speculative to be a reliable indicator of valuation. In such circumstances the tax assessor may base his assessment upon a more reliable method of valuation." (Footnotes omitted; emphasis added.)

Emphasized are certain "adjustments" to project income. The factors mentioned are by no means exhaustive. They were mentioned to illustrate that a projected income figure arrived at by virtue of a capitalization of actual income may not reflect a truly accurate picture of a property's fair market value. See *Port Sheldon Twp v Ottawa County*, 80 Mich App 91; 263 NW2d 299 (1977); *Ramblewood Associates v City of Wyoming*, 82 Mich App 342; 266 NW2d 817 (1978); *Wolverine Tower Associates v Ann Arbor*, 96 Mich App 780; 293 NW2d 669 (1980). They were not mentioned as reasons to ignore the use of actual income in calculating projected income in the instant case.

The right to repossession and the length of the lease in the instant case were accorded value in the Tax Tribunal's calculations by adjusting the rate of capitalization.

## C

The precise error in the tribunal's calculation of true cash value having been indicated, and the Tax Tribunal having made detailed findings of fact

on the expense and capitalization figures to be utilized, the *actual* per square foot rental value need now only be "plugged into" the formula to arrive at projected income.[8]

### III

Saginaw Township contends that to predicate value of a given property upon the taxpayer's rate of return under an economically unfavorable lease,

[8] See Part IV, *post.*

The Tax Tribunal set forth its calculations as follows:

#### 1971

| Gross Income | $214,522 | (at $2/sq. ft.) |
|---|---|---|
| Vacancy & Credit Loss | −10,726 | (5%) |
| Effective Gross Income | 203,796 | |
| Expenses | −33,866 | |
| Net Income | $169,330 | |
| Overall Rate | 10.00 % | |
| Tax Rate | 2.23 | |
| Capitalization Rate | 12.23 % | |

Value estimate by income approach:

$$\frac{\$169,930}{.1223} = \$1,389,452$$

#### 1975

| Gross Income | $241,339 | (at $2.25/sq. ft.) |
|---|---|---|
| Vacancy & Credit Loss | −12,067 | (5%) |
| Effective Gross Income | 229,272 | |
| Expenses | −41,400 | |
| Net Income | $187,872 | |
| Overall Rate | 10.50 % | |
| Tax Rate | 2.25 | |
| Capitalization Rate | 12.75 % | |

Value estimate by income approach:

$$\frac{\$187,872}{.1275} = \$1,473,506$$

The Tax Tribunal made findings of fact that the actual rental income per square foot under the long-term lease was $1.30 and $1.60 for the years 1971 and 1975, respectively.

while on the other hand valuating unencumbered property at current market level, is violative of the constitutional requirements of uniformity of assessment and due process.[9]

The Tax Tribunal expressed much the same concern. In the Tax Tribunal's opinion not only must a valuation method reflect the value of property on the investment market, but it must also produce uniformity of assessment. Because a determination of projected income based on actual rental would depend upon the rental provided in the long-term lease, the Tax Tribunal felt uniformity of assessment could never be achieved unless market rent was utilized in every calculation.

We are not unmindful of the primacy of uniformity and equality in assessment. See *Allied Supermarkets, Inc v Detroit,* 391 Mich 460; 216 NW2d 755 (1974); *In re Appeal of General Motors Corp,* 376 Mich 373; 137 NW2d 161 (1965). The township's argument, however, begs the question. The touchstone of uniform assessment is the true cash value or usual selling price of the property. Assessment decisions must recognize limitations or restrictions which have a bearing on the selling price of property. *Brae Burn, Inc v Bloomfield Hills,* 350 Mich 425; 86 NW2d 166 (1957).

The township's appraiser testified that the property in the instant case would be bought and sold based upon the actual contract rent received under the long-term lease. We find that with certain adjustments this represented the true cash value

---

[9] Const 1963, art 9, § 3, provides, in part, as follows:

"The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed * * *."

Pursuant to this constitutional grant of authority, the Legislature enacted MCL 211.27; MSA 7.27, which has been set forth and discussed at length above.

of the property. Uniformity is achieved by assessing all property with the same true cash value at a consistent level.

We find C.A.F.'s answer to the Tax Tribunal's concern for uniformity of assessment persuasive. Properties may have similar physical characteristics, but differences in economic factors will determine the usual selling price of the properties. Properties encumbered by different lease terms, zoning restrictions, or deed restrictions, although physically similar, would not have the same cash value on the open market. See *Kensington Hills Development Co v Milford Twp,* 10 Mich App 368; 159 NW2d 330 (1968); *Lochmoor Club v Grosse Pointe Woods,* 10 Mich App 394; 159 NW2d 756 (1968). It would be incongruous, indeed violative of the rule of uniformity, to assess two properties the same despite the fact that their usual selling prices are different.

We find no uniformity or due process violations in an assessment premised on true cash value as defined by this Court.

## IV

We conclude that in failing to use actual income as the basis of its capitalization of income, the Tax Tribunal disregarded the mandate of *CAF Investment Co v State Tax Comm,* 392 Mich 442; 221 NW2d 588 (1974), and thereby committed error.

We direct the Tax Tribunal to enter a specific order forthwith and bring an end to this excessively protracted litigation.

Using the taxpayer's actual income and expenses (which were accepted by the Tax Tribunal as accurate), and vacancy factor, and the rate of

return and tax rate adopted by the Tax Tribunal, the values for 1971 and 1975 are as follows:

|  | 1971 | 1975 |
|---|---|---|
|  | $1.31/sf | $1.63/sf |
| Gross income | 141,000 | 174,554 |
| Vacancy and credit loss | −2,820 (2%) | -0- |
| Effective gross income | 138,180 | 174,554 |
| Expenses | −33,866 | −41,064 |
| Net Income | 104,314 | 133,490 |
| Overall rate | 10.00% | 10.50% |
| Tax rate | 2.23% | 2.25% |
|  | 12.23% | 12.75% |

Value Estimate:

1971— $\dfrac{104,314}{.1223} =$    $852,935.40

1975— $\dfrac{133,490}{.1275} =$            $1,046,980.30

The 1971 value was applied to the years 1972, 1973, and 1974 as well.[10] Thus, capitalization of actual income yields the following figures:

| Tax Year | Cash Value | Assessment Level | Assessment |
|---|---|---|---|
| 1971 | $ 852,935.40 | 17.04% | $145,340.19 |
| 1972 | 852,935.40 | 50.00% | 426,467.70 |
| 1973 | 852,935.40 | 48.44% | 413,161.90 |
| 1974 | 852,935.40 | 50.00% | 426,467.70 |
| 1975 | 1,046,980.30 | 50.00% | 523,490.15 |

It is hereby ordered that the Tax Tribunal enter a final order in accordance with the foregoing figures. Interest on any refund shall be calculated as prescribed by MCL 205.737(4); MSA 7.650(37)(4).

---

[10] As to the years 1972, 1973 and 1974, the Tax Tribunal explained that the parties had submitted "estimates of value" for those years but characterized "these opinions" as "unsubstantiated estimates" and stated its conclusion that it should "restrict their use solely to determining that no unusual fluctuation of true cash value occurred in the intervening tax years". The Tax Tribunal concluded that "[t]here [was] no evidence that such a fluctuation occurred".

· No costs, a public question being involved.

COLEMAN, C.J., and KAVANAGH and LEVIN, JJ., concurred with RYAN, J.

LEVIN, J. *(concurring).* I am in agreement with Justice RYAN's analysis and disposition and have therefore signed his opinion. I write separately to address some of the considerations treated in the other opinions.

## I

The lease between C.A.F., as lessor, and K-Mart, as lessee, is referred to in Justice MOODY's opinion as an unfavorable lease for the lessor. Justice FITZGERALD's opinion seems to be saying something akin: that K-Mart was able to receive more favorable lease terms than a more marginal tenant and that that was a factor justifying the Tax Tribunal in not considering actual income. It is further suggested that the lessee's interest, as well as the lessor's interest, should be valued to arrive at the combined and therefore true value.

## A

The constitutional standard is the market, "true cash value".[1] If a desirable tenant is able, in an arm's-length bargain, to obtain more favorable terms than a less desirable tenant, the rent it pays is nevertheless the going market rate for such a tenant. If a desirable tenant obtains favorable

---

[1] While the Constitution states that "[t]he legislature shall provide for the determination of true cash value", Const 1963, art 9, § 3, it does not empower the Legislature to establish a standard other than or to qualify the constitutional standard of "true cash value". I therefore find unpersuasive argument based upon the statutory term *"usual* selling price". MCL 211.27; MSA 7.27 (emphasis supplied).

terms, it is because that tenant is desirable; the rent it pays is the fair market value of having that desirable tenant. If another tenant pays a higher rent, it is not because the property is worth more but because the actual market value of its tenancy is of less value, due, for example, to the greater anticipated wear and tear to the property or greater financial insecurity of the tenant. In a perfect market the differential in rentals between tenants of comparable properties will not necessarily lead to a different market value for the properties. An investor valuing the income stream to be provided by a long-term lease with a less desirable tenant would apply a capitalization rate discounting the higher rentals paid by that tenant in recognition of the tenant's characteristics that caused the landlord to charge a higher rental.

In any case, what another tenant might pay is irrelevant to determining the true cash value of property encumbered by a long-term lease. The value of the property is its value as it is, *i.e.*, as encumbered. To say that its value would be higher if it were rented to another tenant when it cannot be rented to another tenant is to deny the legal and economic reality of the encumbrance. As Justice Ryan implies,[2] the value of property is af-

---

[2] Justice Moody, relying on *NeBoShone Ass'n, Inc v State Tax Comm*, 58 Mich App 324; 227 NW2d 358 (1975), attempts to distinguish the instant case from those cited by Justice Ryan by saying that in the case of a zoning or deed restriction "the limitation was imposed by the actions of a third party" whereas a lease is a self-imposed restriction.

In *NeBoShone* the Court of Appeals held that where a seven-member association owned a large tract of property used for their own recreation and the sale of an interest in the property was subject to approval by a majority of the members, such a restriction should be taken into account by the assessor because the owners could bar any sale for a period of years and claim there was no market or true cash value. Without addressing the merits of *NeBoShone*, it is clear that the danger presented in that case is not presented here. In *NeBoShone* the seven association members had an incentive to hold down

fected by a lease in the same manner as its value is affected by zoning or deed restrictions.

The argument that the lessee's interest should be valued as well as the lessor's interest is an alternative form of the argument that the property should be valued at what another, hypothetical tenant would pay: the lessee's interest is the degree to which the lease is "favorable" to him, *i.e.,* the difference between what he is paying and what the owner would presumably obtain from another tenant. Thus, valuing the lessee's interest again seeks to value the property as if it were unencumbered when it is actually encumbered.

Moreover, valuing the lessee's interest would be to substitute a hypothetical rental for the rental reserved in the lease. To do so would be to eliminate all relation to actual income and thus to reverse, *sub silentio,* the first *CAF* decision. Separately valuing the lessee's interest and combining it with the lessor's interest will produce a result diametrically opposed to the original *CAF* opinion.

Adding an enhanced value of the lessee's interest to the lessor's interest where the property is bound to a long-term lease and taxing them together is as unjustified as the Internal Revenue Service saying to a taxpayer that he was imprudent to buy long-term Treasury bonds a number of years ago at 5% when he could now buy 90-day Treasury bills at 15% and that his income from those bonds, for tax purposes, will be deemed to be 15%.

---

their assessment since the property was not income-producing. A long-term lessor, however, would lose more in income than could ever be gained by reducing the assessment. With no incentive to take a lower rent, there is no reason not to consider the effect of the lease on the property's true cash value. This is not a case of the property owner controlling the assessor; rather, the lease, entered into and based upon market conditions, controls the assessor. The Constitution requires the dominance of the market.

The Tax Tribunal, and the opinions which would sustain its decision, proceed as if the portion of the lease which is favorable to the taxing authority, *i.e.,* the portion which gave rise to the improvement and obliges K-Mart to remain at this location for a minimum of 20 years, is viable, but the portion which the taxing authorities find unfavorable, *i.e.,* the rental terms, is not viable and the rent should be computed as if K-Mart were willing to enter into a brand new lease at this location at a rental which reflects increased costs of construction and financing—costs not borne by this landlord when this 8- or 12-year old building (in 1971 and 1975 respectively) was constructed. The taxing authorities should not be permitted to have it both ways—either the property is encumbered or it is not.

No one could be found to buy this property for what even the owner claims it is worth unless it were "encumbered" with the K-Mart lease and the assured cash flow that goes with it. This Court cannot legitimately allow local taxing authorities or the Tax Tribunal to evaluate the property as if there is a K-Mart lease encumbrance, which alone makes it saleable at any price that would justify current assessments, and ignore the rent reserved in that lease.

Finally, to ignore the lease denies the circumstances which made construction of the structure possible. No one, lessor or lessee, would be willing to erect and no mortgagee would provide funds for an improvement without some assurance that the lessee can remain in possession if it is paying for the improvement or that it will remain if the landlord is paying for the improvement, especially if the building is designed to the lessee's specifications. The lease embodies the commitment of the

lessor and the lessee, each thereby creating value which might not otherwise exist and forgoing other opportunities. This kind of large, specialized structure would not have been constructed but for the "encumbrance" of a long-term lease from some desirable lessee. Since there would be no structure to tax without such an encumbrance, it is not appropriate to evaluate the property as if it could be rented to someone else.

The opinions which would sustain the Tax Tribunal would substitute for the constitutionally prescribed market-based standard of true cash value a hypothetical value, ignoring the lease which alone creates value of this dimension on land which otherwise might be still vacant or less valuably improved. Nothing in the record shows that if this lease had not been entered into a structure would have been erected producing as much in taxes as are derived even when based on the *actual* income.

## B

*In re Petition of Auditor General,*[3] is relied on to support the argument that the value of the lessee's interest should be assessed to the lessor. In that case this Court said:

"It is the rule in this state that a parcel of real estate must be assessed as an entirety, 1929 CL 3390, 3391, at cash value, including worth of standing timber, mineral rights, 'water power and privileges,' etc., § 3415. This legislative policy is emphasized by the fact that the statute mentions only a single exception, *i.e.,* the interests of tenants in common, § 3394."

---

[3] *In re Petition of Auditor General,* 260 Mich 578, 581; 245 NW 522 (1932).

It is urged that "[t]o assess this 'parcel of real estate * * * as an entirety' requires that the lessor's and the lessee's interest be considered." Such a reading extends *Auditor General* beyond its precedential bounds. In *Auditor General* this Court held that "flowage rights" sold by the landowner before assessment of taxes should have been assessed to the landowner. In so holding, the Court found controlling two earlier decisions holding that mineral rights[4] and standing timber[5] must be assessed as part of the real estate although separately owned. In all three cases, the Court relied on specific statutory directives[6] and concluded that *natural* aspects of the land which were still attached should be assessed to the owner of the land. The statutory list of factors to be considered by the assessor specifically included the natural elements involved in those cases—standing timber, water privileges and minerals.[7] The Courts understand-

[4] *Curry v Lake Superior Iron Co,* 190 Mich 445; 157 NW 19 (1916).

[5] *Fletcher v Alcona Twp,* 72 Mich 18; 40 NW 36 (1888).

[6] "That all property, real and personal, within the jurisdiction of this state, not expressly exempted, shall be subject to taxation." 1897 CL 3824; 1915 CL 3995.

"For the purpose of taxation, real property shall include all lands within the state, and all buildings and fixtures thereon, and appurtenances thereto, except such as are expressly exempted by law." 1897 CL 3825; 1915 CL 3996.

"The words 'cash value,' whenever used in this act, shall be held to mean the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained therefor at private sale, and not at forced or auction sale. In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, quantity and value of standing timber, water power and privileges, mines, minerals, quarries or other valuable deposits known to be available therein and their value." 1897 CL 3850; 1915 CL 4021.

[7] In *Curry, supra,* p 450, the Court also noted that in enacting 1911 PA 51 the Legislature changed the prior policy by requiring that all mineral rights in lands should be assessed separately. This act was repealed four years later, which the *Curry* Court interpreted as manifesting a legislative intent to require assessment of mineral rights to the owner of the fee.

ably concluded that the assessment must include the value of all such elements of the land.

In *Auditor General* and its predecessors the identifiable, severable interests in natural resources were clearly subject to ad valorem taxation and the question was to whom such interests should be assessed—the owner of the fee or the owner of the severed interest. In the instant case the question posed is whether a leasehold is, for ad valorem tax purposes, an interest separate and apart from the fee and, if so, to whom it should be assessed. I conclude that the fee cannot be valued apart from the lessee's use and the mutual commitments of the lessor and lessee reflected in the lease.

## II

Even if it were proper to value the lessee's interest or the rental that could be obtained from another tenant, there is no probative evidence in this record which would support a valuation other than one based upon the income actually derived from this property. There is no evidence of a rental or sale of a comparable property in the period 1971-1975 in the Tri-City area, to say nothing of the immediate area in which this building is situated.

Evidence of what K-Mart or other tenants are paying for comparable buildings in other areas is worthless without evidence that another tenant (or K-Mart itself) could be found to rent this building. K-Mart does not, at least as far as this record shows, rent 8- or 12-year-old buildings. It appears that when it wants a new location it also wants a new building. It doesn't take leftovers. The proba-

bility is that if this building had been empty on the tax date, no responsible tenant would have been found to rent as is and if it were to be rented or sold someone would be obliged to spend a considerable sum converting it either to smaller stores or to another use. That has generally been the history of Grant, Arlan's, and other discount department stores which have been vacated.

There is nothing in this record to justify the conclusion that any tenant could be found to pay more than the K-Mart rental of $1.31 and $1.63 per square foot actually derived in those years or, indeed, that a tenant could be found who would pay even that much.

In reaching its result the Tax Tribunal relied on evidence of leases asserted to be comparable. The evidence of comparability in each instance was either inadequate or non-existent. The only evidence offered was of leases in other years with other tenants or with K-Mart in various communities other than the Township of Saginaw, all a considerable distance from Saginaw.[8]

This lease was entered into in 1962 and construction was completed in 1963. There are 107,-260 square feet. The base rent is $137,287, or $1.28 per square foot. K-Mart pays additional rental of 1% of gross sales in excess of $6,864,350.

Under this "unfavorable" lease the landlord received additional rentals and combined (base and percentage) per-square-foot rentals as follows:

|      | Additional   | Combined Square Foot |
|------|--------------|----------------------|
| 1971 | $ 3,863.00   | $1.31                |
| 1972 | 18,060.20    | 1.45                 |
| 1973 | 25,397.01    | 1.53                 |
| 1974 | 32,664.06    | 1.58                 |
| 1975 | 37,267.00    | 1.63                 |

[8] The only evidence presented relating to K-Mart stores located in Saginaw was incomplete. Two such stores were listed among the properties asserted to be comparable but each was missing either the size or the rental of the building. Thus, no comparison was possible.

The Tax Tribunal, based on the testimony of an appraiser for the State Tax Commission who appeared for the township, found that the "current rental income" was $2.00 per square foot in 1971 and $2.25 per square foot in 1975. The basis for those figures is the following table of "comparable" rentals:

| Lessee | Location | Year | Square Footage | Rate |
|--------|----------|------|----------------|------|
| Yankee | Mt. Pleasant | '63 | 31,895 | 1.41 |
| Bargain City | Monroe County | '65 | 71,556 | 1.51 |
| Topps | Westland | '66 | 86,228 | 1.51 |
| Tempo | Sault Ste. Marie | '67 | 33,160 | 1.15 |
| Tempo | Alpena | '67 | 40,861 | 1.30 |
| W.T.Grant | Lapeer | '72 | 52,571 | 2.19 |
| W.T.Grant | Hillsdale | '73 | 56,216 | 2.45 |
| W.T.Grant | Albion | '73 | 52,571 | 2.19 |
| W.T.Grant | Traverse City | '73 | 94,557 | 2.21 |
| K-Mart | Walker (Kent Co) | '65 | 118,433 | 1.90 |
| K-Mart | Ypsilanti | '65 | 83,134 | 2.08 |
| K-Mart | Westland | '66 | 109,884 | 2.09 |
| K-Mart | Warren | '69 | 121,298 | 2.20 |
| K-Mart | Lansing | '69 | 119,650 | 2.50 |
| K-Mart | Lansing area | '70 | 122,362 | 2.55 |
| K-Mart | Lansing area | '70 | 123,062 | 2.44 |

(Only percentage leases are shown.)

These leases, apparently, were all of brand new stores built for the tenant, or at least there is nothing to indicate otherwise.

The foregoing list of "comparables" compiled by the township's witness does not indicate that the rent K-Mart pays is below market. K-Mart's rentals for stores built in 1969 of $2.20 and $2.50 plus 1% of overage sales are on a par with the rent paid by other tenants, e.g., W.T. Grant, who are now defunct.

The foregoing list indicates that rentals vary greatly depending on location. For example, the rentals on two leases K-Mart entered into in 1969,

one in Warren and one in Lansing, are $2.20 and $2.50, respectively, a variance of almost 14%.

Nor is there any basis for assuming that K-Mart would have paid in 1971 and 1975 for the lease of an 8- or 12-year-old building as much as it was then willing to pay for a brand new building located in a different community. These rentals simply are not comparables.

The Tax Tribunal, in effect, ignored the reproduction cost and market approaches to value and determined the value solely on the basis of the income approach using the higher per square foot rates of $2.00 and $2.25. Although the Tax Tribunal ignored these alternative approaches to valuation, I mention them because it may be thought that on still another remand the Tax Tribunal could properly consider them.

The township presented an estimate of true cash value based on the reproduction cost approach.[9]

_____

[9] This method is applied by examining the structure on the property and calculating the present cost of reproducing it. The current reproduction cost is then depreciated for physical wear-and-tear and economic obsolescence. The value ascribed to the building is then combined with an estimate of the land value to arrive at an estimate of the value of the property.

Comparables are generally available for most kinds of properties, residences and small commercial properties and offices, but there are some properties for which there are no comparables simply because sales are so infrequent or the property is so unique that there is nothing comparable in the neighborhood. In such a case, resort must be had to another method of valuation. In the case of income-producing property, bought and sold largely on the basis of the net income it will produce, the income method is probably the most accurate method of valuation, again absent evidence of comparable sales. Indeed, where there are comparables, they will tend to reinforce the result reached by the income approach. Where, however, there are no comparables we should not encourage appraisers to create pseudo-comparables based on sales of divergent properties. Valuation based upon income is entirely accurate and would probably be used by a buyer and seller; there is no need to go through the rituals of adjusting non-comparables and reducing reproduction cost by economic obsolescence. The latter methods being subject to manipulation, we should not endorse their use except where more reliable evidence of *market* value is unavailable.

But both of the township's assessors testified that an existing lease had no effect on the estimate arrived at by the cost approach. Our first *CAF* decision required that the long-term lease be considered[10] and required that any method of valuation which did not take into account the effect of a lease be rejected. Moreover, there was no evidence indicating that buyers and sellers of commercial property use a cost approach, in sharp contrast to evidence that buyers and sellers of commercial property use the capitalization of income approach. If buyers and sellers of commercial property do not use a technique, estimates of value derived from it have no bearing on the market price of the property, the constitutional standard.

The only evidence of comparable *sales* used in the township's market analysis is equally faulty. The township's witness relied on five sales of K-Mart stores, but conceded that three were inapposite because they were of buildings with net-net, not percentage, leases. He therefore relied on only two sales, a 1968 sale of a Westland K-Mart (a Detroit suburb) and a 1965 sale of a K-Mart in Walker (a Grand Rapids suburb).[11]

---

[10] As stated in the first *CAF* decision:

"It is only because in this case the record indicates that the long-term lease rental fairly reflects economic circumstances at the outset of the lease term and bears a demonstrable relation to true cash value that we require its consideration." *CAF Investment Co v State Tax Comm,* 392 Mich 442, 455, fn 6; 221 NW2d 588 (1974).

[11] The Westland store was built and sold in 1968 at a price which worked out to $12.97 per square foot and yielded a gross rent multiplier of 8.94 (gross rental × gross rent multiplier = sale price).

The Walker store, built in 1964 and sold in 1965, had 118,433 square feet which equalled $15.33 per square foot for a gross rent multiplier of 10.95.

These figures were averaged and adjusted to produce a gross rent multiplier of 10 for both 1971 and 1975 and a value of $15 per square foot in 1971 and $16.50 per square foot in 1975.

Multiplying these figures by the Saginaw Township store's gross income and square footage, the township's appraiser came up with $1,420,000 and $1,609,000 respectively for 1971 and $1,800,000 and

There is no reason to suppose that a sale in 1965 of a building located in Walker built the preceding year or a sale in 1968 of a building in Westland built that very year is a reliable indicator of what an 8- or 12-year-old building located in Saginaw Township would sell for in 1971 or 1975. As shown in the first table, the base rentals of the Walker and Westland stores (located in the largest and second largest metropolitan areas of the state) were $1.90 and $2.09.[12] The rents in Westland and Walker are 1/3 or more greater than for the Saginaw store; K-Mart pays 62¢ more per square foot in Walker and 81¢ more in Westland. Also, these stores were built between 1 and 5 years later. Differences in construction and financing costs may explain some of the differential, but I would expect that location—the value of the land —is another substantial factor.[13]

Manifestly, sales values based on the Westland and Walker properties with leases entered into years before the tax years in question and leases of other stores built at different times in widely differing locations, all the way from the Soo to

$1,777,000 respectively for 1975 which he averaged out to indicate a property value via the market approach of $1,515,000 for 1971 and $1,785,000 for 1975.

[12] All three leases were 1% percentage leases over base rent on approximately the same amount of sales (Walker, $6,917,250; Westland, $6,518,837 and Saginaw, $6,864,350). The stores are all approximately the same size (Walker, 118,433 s.f.; Westland, 109,884 s.f. and Saginaw, 107,261 s.f.).

[13] Since the township's market estimates were derived by averaging the data from only two properties, their statistical value is practically nil. The township's witnesses could have arrived at the same result by averaging innumerable pairs of values. Also, the gross rent multiplier on these two "comparables" differed by approximately 22%, a discrepancy which would have amounted to a $284,000 per year difference in 1971-1974 assessments as calculated by the Tax Tribunal and a $360,000 difference in the 1975 assessments. These differences indicate that the "comparables" were not similar to each other and that closer factual analysis should have been presented to show which, if either, was really comparable to the plaintiff's property.

Kalamazoo, are not probative of what a current market rental would be for this 8- or 12-year-old store located in Saginaw Township in the tax years 1971 and 1975.

Moreover, there is no evidence that if K-Mart had not entered into this lease that it would not, if given the chance in 1971 or 1975, have moved to a newly constructed building at some other location in Saginaw Township or an adjoining community, albeit at a higher rental because of increased costs of construction and financing.

Absent the commitment made at this location K-Mart might have chosen some other site and paid more because of competitive and other locational advantages. Merely because this store does well does not mean that K-Mart could not do better at another location in the area or that if given the choice today it would remain at this site.

I am not suggesting that the burden of proof is on the taxing authorities. Rather, I am suggesting that when they wish to disregard a lease, the burden is on them to come up with something better than the highly artificial evidence produced regarding rentals and sales in altogether different locations of buildings built many years apart. We know nothing about these other buildings. They may be tailored to the needs of their tenants. We know nothing about land values either at the time of construction or in the tax year in question.

I would expect that the paradigm K-Mart store itself has changed over the years and that what was being built in 1971 and 1975 is substantially different from what was built in 1963. K-Mart may be willing to pay more for a more modern, less labor intensive, more fuel efficient or otherwise more efficient store. It may have changed its concept of whether K-Marts are best situated alone or as part of a shopping center.

It was "error of law or adoption of wrong principles"[14] for the Tax Tribunal to uphold the assessment although the taxing authorities failed to present any probative evidence to support the assessment and the lessor presented substantial unimpeached evidence.

## III

Justice MOODY says, and Justice WILLIAMS concurs with him on this point, that the paramount consideration is uniformity.

## A

Justice MOODY's underlying concern appears to be that if commercial property is permitted to be assessed on the basis of actual income from a long-term lease, owners will be able to obtain a tax advantage by setting a rental lower than the market. Owners of other types of property assessed by a comparable sales or reproduction method would therefore pay a non-uniform rate when compared to commercial property owners. This concern is misplaced because no rational owner of income-producing property would choose to reduce rental income by an amount many times greater than could possibly be saved in taxes.

Justice RYAN correctly points out that uniformity is achieved by adhering to the constitutional market-based standard, true cash value.[15] If assessors adhered to that standard, all assessments would, perforce, be uniform. All assessments would be at 50% of true cash value. The reason there is need to adjust assessments because of a lack of

---

[14] Const 1963, art 6, § 28.

[15] See cases cited in Justice RYAN's opinion, p 464.

non-uniformity is that assessors do not assess property solely on the basis of the market price.

Uniformity is not achieved by adhering to a single approach to valuation. While the cost approach may be followed by many assessors, since there is no real relationship between reproduction cost and value, reproduction cost has to be adjusted for economic obsolescence. That introduces a highly subjective element, one frequently responsible for the lack of uniformity in assessments. There is no guideline for economic obsolescence.

Neither is uniformity advanced by attempting to assess all property which appears similar as if it were of equal value. Neither physical similarity nor reproduction cost is the standard, and any attempt to avoid the value set for the property by the market is to dilute, rather than strengthen, uniformity of assessment.[16]

## B

If there truly are a substantial number of situations in which a current rental market in excess of reserved rental creates a favorable lease from the lessee's standpoint with the consequence that the property does not support its fair share of the tax burden, the Legislature may very well be able to rectify the matter by allowing local taxing authorities to tax that favorable lease to the lessee just as it did by allowing taxation of structures built on tax-exempt land.[17]

Similarly, the concern that a property owner will withhold income information from a tax assessor except when such information is to the owner's advantage is exaggerated. In those instances

---

[16] See 1979 PA 114.

[17] MCL 322.424-322.425; MSA 13.724-13.725.

where the owner of a business also owns the property, the income derived may be more reflective of the business conducted on the property than the value of the property and therefore not a reliable indicator of the value of the property. When such information is relevant, as in the instant case, to determining the true cash value of the property, assessors may have an implied right to obtain such information under the statute which provides that income is a factor to be considered in determining the property's selling price.[18] To the extent that the present statute is inadequate and the power to assess does not constitute an adequate enforcement mechanism, the Legislature, again, can provide a solution.

FITZGERALD, J. *(dissenting).* We are asked to determine whether the Tax Tribunal complied with our holding in *CAF Investment Co v State Tax Comm,* 392 Mich 442; 221 NW2d 588 (1974), in the remand proceedings held in this case.

In our 1974 opinion, we stated that actual income which was "relevant to a determination of 'usual selling price' "[1] or "demonstrably related to fair market value"[2] must be considered by the Tax Tribunal in determining true cash value.[3] Thus, the relationship to true cash value having been established, we required only that actual income be considered; not that it necessarily be used in all circumstances and certainly not that it be used exclusively. *CAF Investment Co v State Tax Comm, supra,* 392 Mich 455-456. We set forth a nonexhaustive list of other factors which may be

---

[18] MCL 211.27; MSA 7.27.

[1] *CAF Investment Co v State Tax Comm,* 392 Mich 442, 454; 221 NW2d 588 (1974).

[2] *Id.,* 455.

[3] For the definition of cash value, see MCL 211.27; MSA 7.27.

considered in addition to those listed in MCL 211.27; MSA 7.27. Another factor not mentioned earlier, which may properly be taken into account here, is the value of the lessee's interest in the property.[4]

In the instant case, the Court of Appeals misconstrued the holding in our 1974 opinion by requiring that actual income "must constitute the basis for the valuation". *CAF Investment Co v Saginaw Twp,* 79 Mich App 559, 564; 262 NW2d 863 (1977). As stated above, we required only that actual income be considered by the Tax Tribunal.

I reiterate our holding that actual income, if relevant to a determination of "usual selling price", must be *considered* in arriving at true cash value.[5] It is only one of many factors to be considered and it may be rejected if it is inappropriate as applied to the facts of a particular case. *CAF Investment Co v State Tax Comm,* 392 Mich 456.

The Tax Tribunal considered actual income in

[4] In *In re Petition of Auditor General,* 260 Mich 578, 581; 245 NW 522 (1932), this Court stated:

"It is the rule in this State that a parcel of real estate must be assessed as an entirety ([1929 CL] 3390, 3391), at cash value, including worth of standing timber, mineral rights, 'water power and privileges,' etc. (§ 3415). This legislative policy is emphasized by the fact that the statute mentions only a single exception, *i.e.,* the interests of tenants in common, § 3394."

To assess this "parcel of real estate * * * as an entirety" requires that the lessor's and the lessee's interest be considered. A review of the General Property Tax Act discloses no attempt by the Legislature to distinguish between and tax separately the interests created by the lease. Rather, the tax is levied on the *property* itself.

[5] As Justice MOODY's opinion notes, a majority of states permits the consideration of actual income along with full potential earning capacity. *CAF Investment Co v State Tax Comm,* MOODY, J., p 495. See, also, Anno: *Income or rental value as a factor in evaluation of real property for purposes of taxation,* 96 ALR2d 666, §§ 2, 4a, 8b, 8c, where the annotator concludes that it is well settled that ordinarily actual income may be considered in determining value for taxation purposes. The relative weight to be accorded actual income is left to the discretion of the taxing authority to be determined on the particular facts of each case.

the remand proceedings and rejected its use as inappropriate in this case. Among other things, the tribunal noted in its opinion that the relationship and the lease between C.A.F. and its tenant were not typical of the normal market because of the favored status enjoyed by the limited number of K-Mart developers and because the lessee, being a highly desirable commercial tenant, could receive more favorable lease terms than a more marginal tenant.[6] Furthermore, the tribunal was correct in rejecting C.A.F.'s appraisal since it was predicated solely on the income from the lessor's interest in the property and not on other relevant factors.

I conclude that the Tax Tribunal sufficiently complied with the holding in our 1974 opinion.[7] I,

---

[6] "Petitioner's appraiser testified that there are only 3 or 4 developers in the county *[sic]* who can develop 'K-Mart' stores for S.S. Kresge Company. Although this somewhat cryptic comment was not elaborated on or explained, that fact suggests that certain developers enjoy a favored status with S.S. Kresge Company, and as such the relationship and the lease between Petitioner and its tenant is not typical of the normal market."

"The testimony indicated that S.S. Kresge from a financial standpoint is a highly desirable commercial tenant. The evidence suggests and we conclude therefore that S.S. Kresge Company, as such a favored tenant, could receive more favorable lease terms as to the amount of rent per square foot it would be required to pay, which in turn, unless recognized by use of a lower capitalization rate would result in a subnormal valuation. We find no evidence in Petitioner's appraisal that this factor was given any consideration and conclude as such that the resulting appraisal is questionable by reason thereof."

[7] I disapprove of that portion of the Tax Tribunal's opinion which states:

"Accordingly, guided and controlled as we are by the Supreme Court's prior determination in this case that 'economic income' means 'actual income' we therefore conclude that in providing for its consideration it was not within the contemplation of the Legislature that such a method be used when the actual income realized under adverse lease terms represented only a portion of the commercial income potential of the property involved."

The tribunal may not reject the consideration of actual income, as a general rule, in cases involving adverse lease terms. In all cases, actual income must be considered together with all other relevant

therefore, would reverse the Court of Appeals and reinstate the findings of the Tax Tribunal.

WILLIAMS, J. *(concurring in part with and dissenting in part from both Justices* RYAN *and* MOODY*)*. Our 1974 *CAF*[1] opinion held, *inter alia:* (1) the assessing agency may consider a number of different value components in determining true cash value, including values of comparable properties and the statutory term "economic income" from the subject property; (2) the statutory term "economic income" equates with "actual" rent, not "market" rent; and (3) since the assessing agency reached true cash value by capitalizing "market" rather than "actual" rent,[2] the case must be reversed and remanded "for proceedings consistent with this opinion."[3]

Upon remand, the Tax Tribunal used the same income capitalization assessment formula, and, for all the record shows to the contrary, again through ignorance or arrogance capitalized "market" rent instead of "actual" rent. I concur with my Brother RYAN that in so doing the tribunal directly violated our 1974 *CAF* opinion and the case must be reversed and remanded once again.

However, I dissent from my Brother RYAN's following statements, pertinent to the tribunal's response to our remand. His opinion states:

---

factors and it may only be rejected on the basis of particular facts of the case involved. In this case, because the tribunal considered and rejected actual income on the basis of the unique facts involved here, I do not believe that this gratuitous statement affected the outcome of this case.

[1] *CAF Investment Co v State Tax Comm,* 392 Mich 442; 221 NW2d 588 (1974).

[2] This action was approved by the Tax Tribunal: the Court of Appeals reversed and remanded. *CAF Investment Co v Saginaw Twp,* 79 Mich App 559; 262 NW2d 863 (1977).

[3] *CAF Investment Co v State Tax Comm, supra,* 392 Mich 457.

a) "This Court reversed the tax commission and remanded for a determination of true cash value based on actual income."

b) "We refused to allow the consideration of actual income to be diluted by reference to the potential income of comparable property then, and we do so now."

c) "The precise error in the tribunal's calculation of true cash value having been indicated, and the Tax Tribunal having made detailed findings of fact on the expense and capitalization figures to be utilized, the actual per square foot rental value need now only be 'plugged into' the formula to arrive at projected income." The fact of the matter is the 1974 *CAF* opinion stated:

a) "Reversed and remanded to the Tax Tribunal for proceedings consistent with this opinion."

b & c) "We point out that 'consideration' of the enumerated factors under MCL 211.27; MSA 7.27 does not require that the taxing authority determine projected income under the income capitalization approach upon any one or all of the enumerated factors ('economic' or actual income being one of those factors) so long as the valuation comports with the statute's definition of true cash value as 'usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale.' 'Consideration' of the various factors may well indicate that the application of some or all enumerated factors is inappropriate."[4]

Therefore, on remand, according to our 1974 *CAF* opinion the assessing agency is not limited to "plugging in actual rent" in the income capitaliza-

---

[4] *CAF Investment Co v State Tax Comm, supra,* 392 Mich 456, fn 6.

tion formula, for under MCL 211.24; MSA 7.24, the assessor is required to reach a particular result, *i.e.*, "cash value", not apply a specific formula, such as income capitalization. As a consequence, the assessing agency may use any one of a number of accepted formulas so long as it recognizes the various value components set forth in MCL 211.27; MSA 7.27. That section states: "In determining the value the assessor shall also consider * * * present economic income * * *." Insofar as "economic income" is considered, that term must be interpreted as actual income.

Further, on the second argument of this matter, the import of the requirement of constitutional uniformity was particularly stressed by the assessing agency and considered particularly important by my Brother Moody, with whom I concur on this point. There is no question that the rule of uniformity is of paramount significance in all assessing. But obviously, as my Brother Ryan observed, all property does not require the same assessment because all property is not the same. However, this still leaves the question to be decided, what is the focus of the assessment: a particular lease of significant value, incidentally attached to a piece of property, or, a particular piece of property of significant value, with an unfavorable lease incidentally attached? Obviously, this issue and all the statutory value components must be considered. Importantly, the answers must first come from the assessing agency, MCL 211.24; MSA 7.24, and with rather restricted judicial review.[5]

---

[5] Article 6, § 28 of the Michigan Constitution of 1963, speaking to the scope of judicial review of administrative decisions regarding the property tax, states in pertinent part:

"In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation."

See, also, MCL 211.152; MSA 7.210, citing the above as the stan-

In conclusion, I would reverse and remand for further proceedings not inconsistent with the 1974 *CAF* and this opinion.

BLAIR MOODY, JR., J. *(dissenting).* I dissent. Without overstating the obvious, this case has had a long and tortuous history. In 1962-1963, petitioner, C.A.F. Investment Company, constructed a K-Mart store for its tenant, the S.S. Kresge Company, on a 10.55-acre parcel of land in Saginaw Township. Prior to the actual construction of the store, C.A.F. entered into a lease agreement with its tenant for a term of 20 years with three renewal options of five years each. The lease provided for a fixed rental of $137,287 per year with an additional sum of 1% of gross sales exceeding $6,864,350 per year.

In 1971 petitioner appealed a property tax assessment on its leased property to the Michigan State Tax Commission (hereinafter STC). The STC entered an order sustaining the assessment and the Court of Appeals affirmed. This Court granted leave to appeal and reversed the decision of the Court of Appeals and the STC and remanded to the Tax Tribunal[1] for findings consistent with this Court's opinion. *CAF Investment Co v State Tax Comm,* 392 Mich 442; 221 NW2d 588 (1974).

In April, 1976, the Tax Tribunal after conducting lengthy hearings reached its decision. Petitioner appealed the decision of the Tax Tribunal and the Court of Appeals reversed and remanded for redetermination. *CAF Investment Co v Saginaw Twp,* 79 Mich App 559; 262 NW2d 863 (1977).

dard of review in individual assessment cases before the State Tax Commission.

[1] During the pendency of this initial appeal, the Legislature transferred jurisdiction over property tax appeals from the tax commission to the Tax Tribunal. MCL 205.701 *et seq.;* MSA 7.650(1) *et seq.*

Respondent appealed to this Court and leave to appeal was granted. 403 Mich 801 (1978).

This summary forms the backdrop within which a decision must be reached in this case. While it could be said by some that this case is merely another in a long line of tax cases involving a dispute between a taxpayer and local assessment authorities, this case is of crucial significance to all the taxpayers of Michigan and, therefore, it is imperative to examine in depth the whole history of the matter. With this in mind, this discussion will consist of three parts. First, the decision of the present panel of the Court of Appeals will be analyzed. Second, the original decision of this Court will be focused upon. Third, an issue which was not raised in the prior appeal which is dispositive of this matter will be addressed.

I

The present Court of Appeals panel, in reversing the Tax Tribunal, determined that the tribunal had not complied with the dictates of this Court's earlier decision. The Court found that the tribunal had based its appraisal for property tax purposes upon the rate of return on comparable unencumbered property. The failure of the tribunal to base its projected income calculations upon the actual income of the property constituted a clear error of law.

The Court of Appeals terse analysis is captured in the following two paragraphs, which are quoted in their entirety, *CAF Investment Co v Saginaw Twp, supra,* 79 Mich App 564:

"In its opinion, the Supreme Court held that for the purpose of finding the 'true cash value' of petitioner's property using the capitalization of income approach,

the tribunal could not base its valuation upon a rate of return which comparable unencumbered property could earn in the current market where petitioner's property was in fact encumbered by an unfavorable long-term lease.

"The Court noted that there may be cases in which it would be inappropriate to consider lease term rental as a component of projected income. In this case, however, the Court required that the actual income from the lease could not be ignored and that *it must constitute the basis for the valuation.*\*"[2]

---

"*The tribunal need not utilize actual income as the *sole* basis for valuation, but may adjust that figure to reflect other factors that would affect the 'usual selling price' of the property. *However, actual income must be the starting point for such calculations.*" (Citations omitted.) (Emphasis changed.)

---

The analysis of the Court of Appeals is defective on two levels. There is no suggestion in the origi-

[2] Const 1963, art 9, § 3 provides in pertinent part:

"The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments."

In response to this constitutional mandate, the Legislature has defined the term "true cash value" as follows:

" 'Cash value' means the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale. Any sale or other disposition by the state or any agency or political subdivision of lands acquired for delinquent taxes or any appraisal made in connection therewith shall not be considered as controlling evidence of true cash value for assessment purposes. In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, zoning, existing use, present economic income of structures, including farm structures and present economic income of land when the land is being farmed or otherwise put to income producing use, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available therein and their value.

"Except as hereinafter provided, property shall be assessed at 50% of its true cash value in accordance with article 9, section 3 of the constitution." MCL 211.27; MSA 7.27.

nal *CAF* decision that actual income *must* constitute the basis for valuation. This Court held that actual income cannot be ignored and must be considered in any determination of true cash value. The Court said:

"We point out that 'consideration' of the enumerated factors under MCL 211.27; MSA 7.27 does not require that the taxing authority determine projected income under the income capitalization approach upon any one or all of the enumerated factors ('economic' or actual income being one of those factors) so long as the valuation comports with the statute's definition of true cash value as 'usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale.' 'Consideration' of the various factors may well indicate that the application of some or all enumerated factors is inappropriate. For example, in the event lease rental (in statutory parlance a component of 'economic income') were not arrived at on the basis of arm's length bargaining or in other respects had no relationship to 'usual selling price', as statutorily defined, it would be appropriate for the taxing authority to ignore lease rental as a component of valuation. It is only because in this case the record indicates that long-term lease rental fairly reflects economic circumstances at the outset of the lease term and bears a demonstrable relation to true cash value that we require its consideration." *CAF Investment v State Tax Comm, supra,* 392 Mich 456, fn 6.

It is one thing to say that a particular item must be "considered" in terms of determining value; it is totally another thing to say that a particular item must "constitute the basis" of valuation.

In addition, there is no support for the Court of Appeals conclusion that actual income "must be the starting point" for calculating value. As the above quotation from this Court's *CAF* decision so

vividly demonstrates, economic income or actual income is to be considered. However, present economic income of structures is merely one of a number of statutory terms which must be considered in determining true cash value. While one or another of the terms may be controlling in a given situation in determining true cash value, all must be considered equally.

Because the decision of the present panel of the Court of Appeals extends the original *CAF* decision beyond the bounds stated by this Court, the decision must be viewed as erroneous.

## II

Having determined that the Court of Appeals decision was in error, we must examine this Court's original *CAF* decision to ascertain the exact holding of this Court. Further, it is imperative to review the original *CAF* decision in light of certain theoretical and practical problems which cast doubt on this Court's analysis and result in that case.

At the very heart of the controversy in the original *CAF* decision was the definition of the term "true cash value". The Legislature had defined the term as follows:

" 'Cash value', means the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale. Any sale or other disposition by the state or any agency or political subdivision of lands acquired for delinquent taxes or any appraisal made in connection therewith shall not be considered as controlling evidence of true cash value for assessment purposes. In determining the value the assessor shall also consider the advantages and disad-

vantages of location, quality of soil, zoning, existing use, *present economic income of structures,* including farm structures and present economic income of land when the land is being farmed or otherwise put to income producing use, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available therein and their value.

"Except as hereinafter provided, property shall be assessed at 50% of its true cash value in accordance with article 9, section 3 of the constitution."[3] (Emphasis added.) 1973 PA 109.

The STC tax appraiser in assessing the value of the property owned by C.A.F. interpreted the phrase "present economic income of structures" as being synonymous with a standard appraisal term called "economic rent". Economic rent is a hypothetical figure derived from the approximate median ratio which rental per square foot bears to actual sales per square foot for similar properties.

With the economic rental figure computed, the STC appraiser then calculated the value of the whole C.A.F. property by the use of two standard appraisal techniques, namely the "reproduction cost" approach and the "market" approach. Reproduction cost is defined as the amount of money, based on current prices in the market, that would be required to duplicate a building or improvement with a new property or replica, made of the same or basically similar materials. The value of the property is arrived at by the following formula: estimated reproduction or replacement cost of the building new, less estimated accrued depreciation, *plus* the estimated land value. The "market" approach uses a comparison of the property

---

[3] It is noted that the Legislature has enacted certain amendments to this statutory provision. None of the amendments, however, affect the decision in this case.

with the actual sales of other comparable properties. Both approaches rely on estimated land value. Neither approach provides for inclusion of the actual income produced by the property.

This Court rejected the STC's appraisal techniques, saying:

"The tax commission's position is that determination of 'economic rental' (the equivalent of 'economic income') in a property tax valuation context may proceed on the assumption that the property was available to rent in the marketplace. The tax commission would have us equate the definition of the statutory term 'economic income' as found in MCL 211.27; MSA 7.27 with their concept of 'economic rent' and thereby justify ignoring, for valuation purposes, the fact that the piece of property in question is not available in the rental marketplace by virtue of existence of a long-term lease. We conclude that such a construction of 'economic income' is not permissible." *CAF Investment Co v State Tax Comm*, 392 Mich 451-452.

The Court went on further to define the statutory term "economic income" as actual income:

"Unlike 'economic rent', 'economic income' is not a well-defined term of art. Given this fact, the statutory meaning of this term must be derived from the statutory and constitutional context within which the term is used. From this context it is apparent that the Legislature intended that 'economic income' would have relation to the definition of the 'usual selling price' (or fair market value) of property under assessment. The tax commission's construction permits the assessor to contend that actual income relevant to a determination of 'usual selling price' may be ignored. If the Legislature intended the construction urged by the tax commission it was incumbent upon that body to make such intention apparent by its choice of statutory language. Given a failure of clear legislative expression in this regard, such a construction is not tenable. We conclude

that 'economic income' as used in MCL 211.27; MSA 7.27 means actual income." (Footnote omitted.) *CAF Investment Co v State Tax Comm,* 392 Mich 454.

Because the "reproduction cost" and "market" approaches require the use of hypothetical, estimated value, neither approach was held to be applicable. In their place, the *CAF* Court substituted the "income capitalization" approach. This method of real estate evaluation permits the estimation of value based on factual data with respect to income yield of the property. It is a mathematical process for converting the stream of income derived from real estate into capital value. Value may be based on the present and prospective income from the property. It also may be based on the potential earning capacity of the land. Since the income capitalization approach provided a means for determining value based upon actual income, this Court endorsed the approach.

This Court concluded its discussion by saying:

"It is only because in this case the record indicates that long-term lease rental fairly reflects economic circumstances at the outset of the lease term and bears a demonstrable relation to true cash value that we require its consideration." *CAF Investment Co v State Tax Comm,* 392 Mich 456, fn 6.

This Court's definition of economic income as actual income and the Court's rejection of the reproduction cost and market approaches is inherently suspect in several ways.

A

This Court's *CAF* decision does not comport with the decision of *any* other jurisdiction in the United

States which has considered the question. Construing state property tax statutes with language similar to the Michigan statute, in the context of a property tax assessment on land encumbered by a long-term unprofitable lease, the various courts have applied three differing but amazingly similar analyses.

First, there is a minority of jurisdictions which absolutely rejects the use of actual income but rather relies on the full potential earning capacity of the land regardless of the lease. *Donovan v Haverhill,* 247 Mass 69; 141 NE 564 (1923); *Richmond, F & P R Co v Commonwealth,* 203 Va 294; 124 SE2d 206 (1962); *Yadco, Inc v Yankton County,* 89 SD 651; 237 NW2d 665 (1975). *Cf. State ex rel Park Plaza Shopping Center, Inc v Board of Review for Madison,* 61 Wis 2d 469; 213 NW2d 27 (1973).

The second group, which comprises the majority of courts, permits the consideration of actual income along with full potential earning capacity in determining the value of property. These courts, however, place little emphasis on actual income and allow actual income to be disregarded in most cases in favor of earning capacity. *Rowland v City of Tyler,* 5 SW2d 756 (Tex Comm of Appeals, 1928); *People ex rel Gale v Tax Comm of New York City,* 17 AD2d 225; 233 NYS2d 501 (1962); *In the Matter of the Ad Valorem Valuation of Property of Pine Raleigh Corp,* 258 NC 398; 128 SE2d 855 (1963); *McCrory Stores Corp v Asbury Park,* 89 NJ Super 234; 214 A2d 526 (1965); *C C Anderson Stores Co v State Tax Comm,* 91 Idaho 413; 422 P2d 337 (1967); *Springfield Marine Bank v Property Tax Appeal Board,* 44 Ill 2d 428; 256 NE2d 334 (1970); *Crossroads Center (Rochester), Inc v Comm'r of Taxation,* 286 Minn 440; 176 NW2d 530

(1970); *Pima County v Trico Electric Cooperative,* 15 Ariz App 517; 489 P2d 1219 (1971); *Kargman v Jacobs,* 113 RI 696; 325 A2d 543 (1974); *Demoulas v Town of Salem,* 116 NH 775; 367 A2d 588 (1976).

The third group of jurisdictions, found in older decisions, places substantial emphasis on the actual earnings from the encumbered property. But even these courts, unlike this Court in its *CAF* decision, allow the consideration of "earning capacity" and do not wholly denigrate the cost of reproduction or market approaches to valuation. *In re Taxes B P Bishop Estate,* 27 Hawaii 190 (1923); *Somers v Meriden,* 119 Conn 5; 174 A 184 (1934).

Representative of the analysis of those jurisdictions which totally abrogate the use of actual income in determining property valuations is the following statement from the Massachusetts Supreme Court:

"Taxation is a practical matter, and mathematical uniformity in the distribution of the public burden arising from governmental expenses is an impossible attainment. The difference in income derived by the owners from different parcels of realty of substantially the same market value might be due to imprudent management, irresponsible tenants or disadvantageous leases. The tax to the owner receiving the smaller income is undoubtedly a heavier burden than it is to a neighbor who obtains a greater income. Such inequality arises from business and economic conditions. It cannot be attributed to the taxing statute." *Old Colony R Co v Assessors of Boston,* 309 Mass 439, 446; 35 NE2d 246 (1941).

There is a common thread between this statement and the statement of a New York court, which is representative of the analysis and ratio-

nale of the majority of jurisdictions. That court said:

"An outstanding lease may be a benefit or a detriment to the subject property, and thus its duration, covenants and the rental fixed are simply elements along with many other considerations used to arrive at the value of the property. The amount of rental fixed by a lease, even though negotiated at arm's length, could be very misleading, as to the true value of property, for it is well known that many rental contracts may be at excessive or inadequate rentals because of poor business judgment on the part of one party or another. Then, too, long-term rental contracts may be made in boom times or in times of depression, so do not necessarily reflect true value on a change in times. And, as Mr. Justice Bergan, sitting in this court, has very appropriately said, 'Assessments cannot be made to trail behind every turn in the fortunes of real property. There are times when property must bear a share of taxation proportionate to value even though it may then have no income, or an income inadequately focused to true value. There are times when the full measure of ephemeral surges of increased income should not be reflected in assessments in fairness to the owner.'

"Of course, an outstanding bona fide lease and the rental income established thereby are matters to be considered in determining the 'full value' of the whole property, land and improvements. Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal. * * * But when there is evidence that factors such as long-term leases made under distress or boom conditions affect the actual rent, the weight to be given to the actual rent must be discounted accordingly. * * *

"So, the existence of an outstanding lease at an unrealistically low rental * * * of the property, is not to be used as a basis for calculating actual value." (Citation omitted.) (Emphasis added.) People ex rel Gale, supra, 229-230.

All the jurisdictions express the concern that

the net effect of reliance on actual income in determining tax assessments is the destruction of the principle of uniformity in taxation. All the courts indicate that assessment based on full potential earning capacity is the most fundamentally fair and even-handed method of distributing the tax burden. Thus, reproduction cost and market approaches are as equally valid as the income capitalization approach in calculating true cash value of property.

On a policy level, all of these jurisdictions look with great disdain upon the effect of reliance on actual income. The effect is to give tax relief and, therefore, subsidize the unwise businessman at the expense of the wise businessman and the rest of the taxpayers of the state. The North Carolina Supreme Court has said it well:

"The statute [tax assessment statute], in fixing the guide which assessors must use in valuing property for taxes, includes as a factor 'the past income therefrom, its probable future income.' But the income referred to is not necessarily actual income. *The language is sufficient to include the income which could be obtained by the proper and efficient use of the property. To hold otherwise would be to penalize the competent and diligent and to reward the incompetent or indolent.*" (Emphasis added.) *In re Property of Pine Raleigh Corp, supra,* 403.

## B

It is important to stop and reflect at this point on the legislative definition of true cash value. While the definition contains various terms, it is without doubt that the most important element in the commercial setting is the "present economic income of structures". Economic income will al-

most always dictate the level of commercial property tax assessment. Thus, by defining economic income as actual income, this Court betrays a rather narrow and unrealistic attitude toward property tax assessment in Michigan.

Property tax by its nature is cumulative; it is a tax on each and every right and interest that attaches to real property. A proper assessed valuation, therefore, must include the value of all the rights which inhere in the property.

The right to current possession under a lease is a right which inheres in the property. If, as in the instant case, the rent paid for the right to possession is less than the current market rate, then the value of the right of current possession will increase in proportion. As the appraiser for the State Tax Commission so ably demonstrated on remand, a lessor's and a lessee's interest is thus created in the land. In order to establish the true value of the land, the value of the right to receive income, the lessor's interest, must be combined with the value of the right of possession, the lessee's interest.

Because this Court's first *CAF* decision focuses on the lessor's right to receive income under the lease, a distorted view of the true cash value of the property results. And, while it is true that any sale of the lessor's interest in the property would reflect the unfavorable lease, the converse, a sale of the lessee's interest in the property, would result in a rate of return which would be much higher than the relatively low rental expense would suggest.

By using a similar analysis to that employed here, on remand the Tax Tribunal attempted to ascertain the true cash value of the C.A.F. property, *i.e., a combination of the lessor's interest and*

*the lessee's interest in the property.* Such an approach is eminently fair and sensible. It truly endeavors to ascertain the *"usual* selling price" of the property as mandated by the Legislature.[4]

## C

Actual income is a very limited tool in determining property tax assessment and its use creates procedural difficulties for the taxing authorities. In addition, the class of individuals who are capable of making use of the actual income method is also extremely limited. The following exchange between Judge Cramer and Norman Daniels, the tax appraiser for the State Tax Commission, at the Tax Tribunal hearings brings the problem into focus:

> *"Cramer:* Well is—well I guess what I'm really get-

[4] The opinion of my colleague Justice LEVIN states: "The opinions which would sustain the Tax Tribunal would substitute for the constitutionally prescribed market-based standard of true cash value a hypothetical value, ignoring the lease which alone creates value of this dimension on land". That statement does not accurately reflect the conclusion of this opinion.

"True cash value" as mandated by the Constitution and defined by the Legislature as "the usual selling price" is not to be based alone upon actual income calculations even according to the original *CAF* opinion. On the contrary, actual income may be ignored as a component of valuation in a given case. As correctly analyzed by its author, my colleague Justice FITZGERALD, the first *CAF* opinion only required "consideration" of actual income under the circumstances of this case. It did not require its use to the exclusion of any other factor.

On remand, the Tax Tribunal appropriately rejected actual income as the sole criterion of value. The tribunal's approach did not ignore the actual income received by the lessor but considered it in combination with the lessee's interest.

In addition, to conclude there was no probative evidence whatsoever that the property could be sold for more than a value based upon actual income, as suggested in the opinion of Justice LEVIN, is to ignore the record and the preponderance of evidence that would support the factual findings of the tribunal. My colleague presents an argument with respect to the probativeness of the evidence which the tribunal, if faced with this assertion, clearly could have chosen not to accept.

ting at is the cost approach the primary basis of—of assessment in the State of Michigan?

*"Daniels:* Yes, I would say it is. The cost approach is the primary basis used.

*"Cramer:* When—when does the income approach become a significant criteria *[sic]* in valuing a given property? If the cost approach is a general—if it's a general basis, when does a cost approach come into play? The income approach, I'm sorry.

*"Daniels:* Well, I think we give more weight to the income approach when the information is available so that we can make the income approach.

*"Cramer:* What do you mean when the information's available?

*"Daniels:* Well, to the typical assessor, all this data is not available to them. In fact, most companies refuse to give their income and expense data to their assessor.

*"Cramer:* Why is that?

*"Daniels:* Because they're not required to do it. There's no law that requires them to furnish that to the assessor. So most of them have to rely on the cost approach, which probably sets the upper limit of value and may not take into effect *[sic]* economic obsolescence, such things as that, as—as well as the income approach would. But I think most assessors are forced to go to the cost approach just because the income approach necessary—yeah—the data necessary to make an income approach isn't available to them and they have no way of forcing each taxpayer to give that data to them. They're—

*"Cramer:* Well, would it be a fair conclusion then that generally when you do get the expense data and you do get lease information it is when that information is of advantage to the taxpayer, to provide that information?

*"Daniels:* Well, almost always when it's to the taxpayer's advantage then the—."

It is clear from this testimony that under normal circumstances the majority of taxpayers in Michigan have their property assessed by the reproduction cost approach. Only income-producing

property can be assessed in terms of actual income by use of the income capitalization approach. But even in this regard the taxing authorities are virtually hamstrung. *Only when it is to the advantage of the taxpayer* will the necessary information be supplied to the assessor for the assessor to use the income capitalization approach for tax assessment purposes. Under this method the ability to control and manipulate property tax assessment rests in the hands of the taxpayer alone.

In this situation, logic would dictate that if the Legislature wanted actual income to be the method or the basis for property tax assessment it would have provided some independent means for the assessor to ascertain actual income. Also, it would seem highly unlikely that the Legislature would define "present economic income of structures" as actual income when only a limited segment of a class of persons would fall into a grouping that would be affected by such a definition. This is particularly true where the constitutional mandate to the Legislature to define the term "true cash value" is found in the same constitutional section which requires uniformity in property tax assessment.

### III

The previous discussion sets forth an issue which was not addressed by this Court in its original *CAF* decision and is raised by the parties here for the first time. This issue concerns the constitutional mandate of uniformity of taxation. It is dispositive of the matter.

In the same constitutional provision which requires that the Legislature "provide for the determination of true cash value" is found the constitu-

tional mandate of uniformity of taxation. Const 1963, art 9, § 3 reads in pertinent part:

"The legislature shall provide for the *uniform* general ad valorem taxation of real and tangible personal property not exempt by law." (Emphasis added.)

The constitutional framers considered uniformity of taxation the paramount goal of all property assessments. The official Convention Committee Comment to art 9, § 3 is illustrative:

"*The important constitutional objective is uniformity of assessment,* regardless of the level at which property is commonly assessed. Permitting the Legislature to fix the standard offers the possibility of moving to a more realistic level such as the 50 per cent of cash value currently used by the State Tax Commission. On this basis actual uniformity could be achieved and a taxpayer aggrieved by an assessment over the level prescribed by law could obtain relief. This section provides that the standard set by the Legislature shall not exceed 50 per cent. Recognizing that some jurisdictions currently assess some property in excess of 50 per cent, effective date of this limitation has been postponed until 1966." (Emphasis added.) 2 Official Record, Constitutional Convention 1961, p 3398.

Cognizant of the intent of the drafters of the Constitution, this Court has always recognized the importance of the principle of uniformity. This Court has said:

"*With the destruction of the standard of cash value, the standard of uniformity becomes even more imperative, not only from tax unit to tax unit but as to the individual taxpayer within a unit. If there was ever any question as to which should control, the principle of equal treatment regardless of cash value is now recognized as being primary.*" (Emphasis added.) *In re Ap-*

*peal of General Motors Corp,* 376 Mich 373, 379; 137 NW2d 161 (1965).

The principle of uniformity of taxation requires neither mathematical equality nor mathematical certitude. What is required is that similar properties within the same district be assessed on a similar basis. If that is done, the actual amount of taxes to be paid will be the same.

It must be recognized, however, that even very similar parcels of land may possess differing attributes which may lead to a disparity in tax assessment. Such a disparity in tax assessment may not in and of itself constitute a violation of the principle of uniformity but it may indicate that something is amiss.

Petitioner in the present case contends that one of the attributes of its property is that it is encumbered by a long-term unprofitable lease. Petitioner contends further that this long-term unprofitable lease should form the basis for projecting any assessment of its property. But what will this do to the principle of uniformity?

Positing for the moment that another parcel of property exists in Saginaw Township upon which there are similar structures to those found on the C.A.F. property but such structures are not encumbered by a long-term unprofitable lease, there can be little doubt that this hypothetical property will bear a considerably greater tax burden than the C.A.F. property. This will be so because actual income will not be the basis of tax assessment of this property. Rather, the property, as is most of the property in this state, will be assessed based upon economic rent by means of the reproduction cost method.

A disparity clearly exists here. But the disparity

is not the result of any innate differences between the two properties. The disparity results because the one taxpayer, because of poor business judgment, has saddled his property with a long-term unprofitable lease while the other taxpayer, because of sound business judgment, has reaped a profit from his land. If this disparity should be sanctioned as a significant viable difference by the taxing authorities, the net effect is to reward the unwise businessman while penalizing the conscientious businessman.

To allow business acumen to form the controlling basis of property tax assessment in Michigan would obliterate the principal concept of consistency. Such a conclusion would seem fundamentally unfair and would result in the doctrine of uniformity becoming a mere sham. In addition, such a proposition would permit the taxpayer to actually manipulate the taxing process for his own purposes. In this regard, the exchange between Judge Cramer and the attorney for C.A.F. at the Tax Tribunal hearing is enlightening:

"*Cramer:* I see. So if a man through imprudence or foresightedness or whatever, enters into a lease, he can influence and thereby, in part, determine what his assessments are going to be.

"*[Counsel]:* That's correct.

"*Cramer:* And he has to be treated on that basis regardless of what happens to the rest of the property owners of the state.

"*[Counsel]:* That's correct."

It can hardly be said that the framers of the Constitution or the Legislature intended such a result.

Valid limitations on the use of land may exist which will lead to disparate valuations of similarly

situated properties. The courts of this jurisdiction have recognized such valid limitations and have found that no violation of the doctrine of uniformity occurs where the taxing authorities take such limitations into consideration when assessing property. See, *e.g., Kensington Hills Development Co v Milford Twp,* 10 Mich App 368; 159 NW2d 330 (1968); *Lochmoor Club v Grosse Pointe Woods,* 10 Mich App 394; 159 NW2d 756 (1968).

In each of the cited cases, however, the limitation was imposed by the actions of a third party. In no case have the courts of this jurisdiction sanctioned a limitation which was imposed on the property by the property owner himself. To the contrary, the Court of Appeals has specifically rejected the proposition that a self-imposed limitation on the use of property can form the nucleus for a property tax reduction. *NeBoShone Ass'n, Inc v State Tax Comm,* 58 Mich App 324; 227 NW2d 358 (1975). The *NeBoShone* Court said:

"A private individual could not self-impose a restriction whereby he might be able to avoid or limit paying his just share of the ad valorem taxes due to government, nor can a corporation." *NeBoShone, supra,* 334.

Finally, the present case is essentially on all fours with a United States Supreme Court case in which the Court struck down a property tax assessment as violative of the Fourteenth Amendment to the United States Constitution and a state constitutional provision requiring uniformity of tax assessment. *Johnson v Wells Fargo & Co,* 239 US 234; 36 S Ct 62; 60 L Ed 243 (1915). In *Johnson,* the state attempted to assess taxes on the "gross net income" derived from property of a corporation within the state. All other assessments

were made on property regardless of the net income derived therefrom.

The Court found that such an assessment was anathema to the principle of uniformity, saying:

"It is enough to say upon this point that, in our opinion, the record does show that the payment to the railroad companies, if not the only basis of the assessments made by the Board, was the principal factor in fixing the value of the property of the express companies for taxation in the State, and the question arises, was such administration of the statute contrary to the requirement of the South Dakota constitution, already quoted, requiring all taxation to be in proportion to the value of the property assessed, and corporation property to be assessed, as near as may be, by the same methods as are provided for assessing the value of individual property. It appears that the South Dakota statutes, other than those relating to railroads, telephone, telegraph, express and sleeping car companies, do not authorize a valuation which considers gross income, and that individuals and other corporations are taxed according to the value of their property, without reference to the income derived therefrom. In other words, property owned by other corporations and individuals is assessed for what it is fairly worth, and a valuation for taxation is not fixed by a method which gives controlling effect to the amount of the gross income derived therefrom. We concur with the Court of Appeals that such procedure is in violation of the provision of the South Dakota constitution, specifically requiring that all taxes levied and assessed upon corporation property shall be as near as may be by the same methods as are provided for the assessment of taxes upon individual property.

*"The stringent provisions of the constitution of South Dakota, then in force, required the adoption of a rule of valuation, as near as might be, of like character in assessing individual and corporate property in the State, and here, the record shows, the valuation of the property of the express companies was based principally upon their gross incomes, determined by the method*

*already described. Such administration of the statute would be illegal, although the law upon its face be unobjectionable."* (Emphasis added.) *Johnson, supra,* 241-242.

Although the facts of the present case represent the flip-side of the *Johnson* case, it is clear that if the Legislature intended the term "present economic income of structures" to mean "actual income", the Legislature has created an arbitrary and irrational classification that cannot be sustained on equal protection and uniformity grounds. There can be no uniformity of taxation if a special group of individuals can claim that property tax must be based on the actual income derived from a self-imposed, unfavorable lease.

### IV

In conclusion, the Court of Appeals has erred by extending this Court's original *CAF* decision beyond the limits stated by this Court. In addition, an analysis of this Court's original *CAF* decision shows that it conflicts with the law of all jurisdictions that have considered the subject, could be interpreted to obligate the acceptance of a distorted view of the true cash value of the property, could penalize the competent while rewarding the incompetent, and permits certain taxpayers to manipulate tax assessments.

The use of actual income as the standard to measure property tax assessment is violative of the state constitutional requirement of uniformity of taxation. It becomes even more evident that this standard shatters the constitutional mandate of uniformity when only particular taxpayers may

chose when or when not to reveal their actual income to require its use to control assessment evaluation.

Although it is respectfully submitted that this Court erred by defining "economic income" as "actual income", the Tax Tribunal, on remand, did consider actual income in evolving its assessment. It was not required to base its evaluation on that factor to the exclusion of any other consideration. Because the Tax Tribunal properly determined the true cash value of the property owned by C.A.F. Investment Company, the tribunal's assessment should be sustained.